IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LARRY COVINGTON

    v.                     :   Civil Action No. DKC 22-2655

UNION MEMORIAL HOSPITAL, et al.

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case are:  (1) the motion for summary judgment filed by Plaintiff Larry Covington ("Plaintiff"), (ECF No. 68); (2) the motion to seal filed by Defendants Medstar Health Inc. ("MedStar") and Union Memorial Hospital ("MUMH") (collectively, "Defendants"), (ECF No. 71); (3) Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment, (ECF No. 72); (4) Plaintiff's motion to quash/dismiss Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment, (ECF No. 77); and (5) Defendants' motion to strike Plaintiff's correspondence, response in opposition, supplement, and second response, (ECF No. 84).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Plaintiff's motion for summary judgment will be denied, Defendants' motion to seal will be granted except to the extent that this opinion discloses information

contained in the exhibits, Defendants' motion to dismiss will be denied but their alternative cross-motion for summary judgment will be granted, Plaintiff's motion to quash will be denied, and Defendants' motion to strike will be denied.

## I.   Background

Plaintiff, who worked for Defendants for about a year and a half, has brought a host of claims, alleging racial and disability discrimination, hostile work environment, and retaliation under federal and state law, and violation of the Family and Medical Leave Act ("FMLA").

Defendants hired Plaintiff to serve as Chief of Security at MUMH beginning on April 15, 2019.  (ECF No. 1 ¶ 14; 72-2, at 14). When he started, Plaintiff worked under the direct supervision of Neil MacDonald ("Mr. MacDonald"), then-Vice President of Operations at MUMH and MedStar Good Samaritan Hospital ("MGSH"). (ECF No. 72-6, at 2).   Edward Johnson ("Mr. Johnson"), MUMH's Director of Safety and Emergency Management, and Stratton Clark ("Mr. Clark"), a Security Department Supervisor and acting Interim Chief of Security, onboarded and oriented Plaintiff.  (ECF Nos. 72-5, at 2-3; 72-7, at 2-3).

On December 21, 2019, Plaintiff forwarded to Mr. MacDonald and Ashley Handwerk ("Ms. Handwerk"), the former Director of Human Resources ("HR"), an email from a team member in his Department complaining that a nurse had used a racial slur.  (ECF No. 68-1,

2

at 44).  Specifically, the team member stated that a patient being triaged said, "I will f-ck you b-ch n-ggers up.  Nurse [] replied 'I'm not black'.  To me Nurse [] appears to be saying that black people are n-gers.  This is offensive and unprofessional."  (ECF No. 82-24, at 3).  Nikki McKoy ("Ms. McKoy), an HR Business Partner, followed up with the team member on January 6, 2020.  (ECF No. 82-13, at 2).

In December 2019, a team member in Plaintiff's Department provided Plaintiff with an image of a meme on a Facebook page. (ECF Nos. 1 ¶ 64; 68-1, at 37).  The meme contains a cartoon depiction of five excrements with faces dressed in clothing with the caption, "Have a very crappy Christmas!"  (ECF No. 68-1, at 37).  Plaintiff asserts that the team member said he saw a group of white nurses laughing at the meme in the emergency room.  (ECF Nos. 1 ¶ 64; 68-1, at 37).  Plaintiff texted Mr. Johnson asking what he thought about the meme.  (ECF No. 68-1, at 38).  Mr. Johnson responded, "That is the character from South Park.  It's a piece of poop that walks around and wishes everyone a merry Christmas.  Although inappropriate it is not a derogatory thing[.]" (ECF No. 82-13, at 3-4).

In or about January 2020, Brian Cawley ("Mr. Cawley") was named Vice President of Operations at MUMH and MGSH in preparation for Mr. MacDonald's retirement in September 2020.  (ECF No. 72-6, at 2).  Mr. Cawley became Plaintiff's supervisor in summer 2020.

(*Id.*).  Defendants assert that Mr. Cawley found that Plaintiff was unable to answer routine questions or provide basic information about his Department or MUMH's security needs.  (*Id.* at 5). Plaintiff argues that this statement is false because "Plaintiff has over 30 plus years in both [l]aw [e]nforcement and [s]ecurity [m]anagement.  Brian Cawley has zero background [or] training in either field."  (ECF No. 81, at 8).

During the COVID-19 pandemic, the Center for Disease Control ("CDC") recommended that N-95 masks be reserved for healthcare providers that had direct contact with plausible COVID-19 patients and provided aerosol-generating procedures.  (ECF No. 72-6, at 3). MedStar experienced a shortage of N-95 masks and updated its policies to reserve N-95 masks only for its onsite healthcare providers who were in direct contact with plausible COVID 19-patients.  (ECF Nos. ECF No. 68-1, at 10-11; 72-6, at 3; 73-30, at 2-3).  MedStar provided other hospital staff with surgical masks, gloves, face shields, and hand sanitizer.  (ECF Nos. 68-1, at 10-11; 72-6, at 3; 72-8, at 9).  MedStar issued a system-wide directive that N-95 masks in stock at any location should be saved only for healthcare providers with direct patient care responsibilities and should not be distributed to any other employees.  (ECF Nos. 68-1, at 10-11; 72-6, at 3; 73-29, at 2-3). This directive applied to every MedStar facility, not just MUMH and not just MUMH's Security Department.  (ECF No. 72-6, at 3).

In April 2020, however, Defendants began distributing N-95 masks to security staff.  (ECF No. 73-29, at 2).  Plaintiff requested N-95 masks for himself and his Department several times.  (ECF Nos. 73-29; 82-6, at 2-4, 7-8; 82-24, at 2; 82-26, at 2, 6-7, 9, 11).

On July 24, 2020, Mr. Cawley went to the Security Department to speak with Plaintiff, but Plaintiff was not there.  (ECF No. 72-6, at 5).  Mr. Cawley asked two Security Department members about Plaintiff's whereabouts, including Deborah Oakley Anderson ("Ms. Oakley Anderson"), and they either refused to tell him or did not know Plaintiff's location.  (*Id.*).  Ms. Oakley Anderson sent an email to Plaintiff later that day stating that she told Mr. Cawley that Plaintiff was not there yet, Mr. Cawley asked if Plaintiff was on PTO, she responded that she was not sure, and Mr. Cawley said, "Don't lie to me . . . where is he, is he there or on PTO?"  (ECF No. 82-3, at 4).  She went on:

> I've worked with Medstar since 1997 and I've had some good experiences working with upper Management.  Never have I ever been insulted, and my integrity questioned, until now.  I feel if Mr. Cawley was not sure why you weren't at work at that time, he probably should've called you and not challenged me about your whereabouts.  I was very disappointed in Mr. Cawley's response to me and in the manner in which he spoke.

(ECF No. 82-3, at 4).  On July 26, 2020, Plaintiff emailed William Pallozzi ("Mr. Pallozzi"), MedStar's Vice President of the Chief

Security Office, to report this incident.   (ECF No. 82-3, at 2-3).   Plaintiff wrote that Ms. Oakley Anderson "stated to me that she wonders if she was not a Black female in her role would he talk to her in this manner."   (ECF No. 82-3, at 3).   Plaintiff explained that he was not on the premises because he was shopping at the Segway store in Annapolis for his Department.   (ECF Nos. 72-6, at 5; 82-3, at 3).   The Segway store, however, had closed a year prior.   (ECF No. 72-6, at 5).   Mr. Cawley asserts that Mr. Pallozzi had already told Plaintiff that the purchase of Segways would not be approved, (*id.*), while Plaintiff asserts that "neither MacDonald, Brian Cawley[,] nor any other Sr. Management ever informed Plaintiff" that the purchase would not be approved, (ECF No. 81, at 9).

Defendants assert that Plaintiff delegated many of his responsibilities to others in the Security Department.   (ECF Nos. 72-6, at 3; 72-7, at 3-4).   Plaintiff contends that this information is "untru[e], modified[,] . . . and/or false" because the Chief of Security is allowed to "designate assignments to supervised staff as needed."   (ECF No. 81, at 5).   Defendants also assert that Plaintiff heavily leaned on Mr. Johnson for tasks such as drafting and administering policies and procedures, (ECF No. 72-5, at 3-4), while Plaintiff contends that he "never leaned [on] or needed to learn [from] Edward Johnson who has zero background in the law enforcement field[,]" (ECF No. 81, at 6).

In Plaintiff's performance review dated September 22, 2020 (covering the year ending June 30, 2020), Mr. MacDonald commented:

> I think overall Larry has had a solid year from a leadership perspective. He is working to bring about change in the culture of the department and elevate the role that our security officers play. He has identified new roles for some of his officers and they appear to be excelling in those roles.
> One thing I would suggest is that Larry works on "Managing Up" less and delegating fewer activities to his supervisors and support staff. As the Director of the department you need to make the difficult decisions and not push them up the chain of command or farm out all the work.

(ECF No. 68-1, at 29). Plaintiff complained about the comment in his performance review to Mr. Cawley. (ECF No. 68-1, at 2).

Mr. Johnson and Mr. Cawley remarked that Plaintiff was often unresponsive, even in emergencies, and often did not carry his walkie-talkie. (ECF Nos. 72-5, at 4-5; 72-6, at 5; 72-8, at 3-8). Defendants assert that carrying a walkie-talkie at all times was mandatory, (ECF No. 72-5, at 4), and Plaintiff argues that it was optional, (ECF No. 81, at 6).

Early in his employment, Plaintiff created his own private parking spot in the MUMH parking garage in a space reserved for security vans. (ECF No. 72-6, at 5). Employees who park in that same area frequently noticed that Plaintiff's parking space was consistently empty. (*Id.*). Mr. Cawley began to suspect that Plaintiff was engaging in theft of company time and resources.

7

(*Id.* at 5-6).  Defendants argue that in summer 2020, Mr. Cawley requested that HR investigate Plaintiff's attendance.  (*Id.* at 6). Plaintiff asserts that this information is "false" because "Defendant still has not produc[ed] any write-ups and/or any discipline action(s) on the Plaintiff[]" and it is implausible that Mr. Cawley could have "conduct[ed] a full investigation into the Plaintiff between the months of June 01, 2020, and October 06, 2020."  (ECF No. 81, at 9, 12).

On September 30, 2020, Mr. Cawley attended a meeting led by Plaintiff and observed that when members of the Security Department raised concerns, Plaintiff did not attempt to address those concerns or take responsibility but instead blamed others.  (ECF No. 68-1, at 2, 6).  Mr. Cawley emailed Plaintiff later that day that this was an example of what Mr. MacDonald had previously characterized as Plaintiff's habit of "managing up" difficult decisions and "delegating out" his duties to support staff.  (*Id.*). Also on September 30, 2020, Mr. Cawley held a bimonthly meeting with Plaintiff.  (ECF No. 72-6, at 6).  He asked Mr. Johnson to prepare a list of security-related tasks that Plaintiff and the Security Department had not addressed.  (ECF Nos. 72-5, at 5; 72-6, at 6; 73-2).  Mr. Cawley reviewed the tasks with Plaintiff. (ECF Nos. 72-5, at 5; 72-6, at 6).  While Mr. Cawley was speaking, Plaintiff physically turned his chair around to put his back to Mr. Cawley.  (*Id.*).  Mr. Cawley instructed Plaintiff to provide a

written update of his progress by October 2, 2020. (*Id.*).
Plaintiff never provided an update and never completed the tasks.
(ECF Nos. 72-5, at 5; 72-6, at 7).

Mr. Cawley received the results of the attendance
investigation in early October. (ECF No. 72-6, at 7). The data
revealed that during the eighteen-week period between June 1 and
October 1 (90 business days), Plaintiff missed 28 days of work
(equating to a 69% show rate). (ECF Nos. 72-6, at 7; 73-3). On
days Plaintiff did report to work, he spent less than 6 hours on
the premises on average (equating to about 70% of a full-time
workday). (*Id.*). Plaintiff never took any personal time off
despite MedStar's policy requiring management to use personal time
off during the COVID-19 pandemic. (ECF Nos. 72-6, at 7; 73-3; 73-
4, at 3; 73-5, at 2). Plaintiff often moved cones and exited from
a garage exit that did not have a scanner to capture his departure
time. (ECF No. 73-3, at 2). Defendants assert that the
investigation revealed that Plaintiff never worked a single night
or weekend, (ECF Nos. 72-6, at 7; 73-3), while Plaintiff provides
an email that he sent on a Sunday stating that he came to work
that day as proof that he did work on weekends, (ECF Nos. 81, at
10; 82-4, at 2).

On October 5, 2020, Plaintiff texted Mr. Pallozzi:

> another night with no sleep, contacted the []
> 24 hour Employees Assist last night.  I was
> informed because of my stress level and high

> blood pressure.  Before I make any decision,
> I need to take leave.  I will be summitting
> three weeks of leave of absence today, I will
> utilize this time to totally focus on my
> health.

(ECF No. 73-9, at 2-3).  Later that day, Mr. Cawley emailed Mr.

Pallozzi and other leadership members regarding the investigation

and his concerns about Plaintiff's performance and attendance

issues.  (ECF Nos. 72-6, at 7; 73-6, at 2).  About an hour later,

Plaintiff emailed Mr. Cawley, Mr. Pallozzi, and the Security

Department that "because of medical reasons, I will be on needed

PTO from 10/06/2020 until 10/20/2020.  I will be checking emails

daily.  [I]f any immediate need(s) please contact Supervisor Darby

at ext.2397.  [S]he will be supervisor in charge in my absence."

(ECF No. 73-8, at 2).  Mr. Cawley responded:

> This is the first I am learning of your
> leave.  Did you go through the office of leave
> management or occupational health for your
> medical leave?  You will need to go through
> the latter before returning to work.  Going
> through offices would have been the proper
> protocol and would [have] also helped start
> the FMLA and/or Short Term disability process.
> Lastly, if you are truly on medical leave you
> should not be checking emails.
>         Is there a reason why you selected Lydia
> Darby to be the acting chief in your absence?
> I will connect with her tomorrow to see if she
> will be handling the various deliverables you
> were working on for submission.
>         In the future, please consult with me on
> operational matters and prior to sending out
> a group email.

(ECF No. 73-10, at 2).  Plaintiff responded:

> Br[ia]n, I stated because of Personal
> medical reasons, I was utilizing PTO. I never
> stated I was taking Medical leave or going out
> on FMLA. As the Chief of Security, I appoint
> one of my three Security supervisors
> assignments every[]day. All three are very
> competent, have the necessary ability,
> knowledge to perform successfully. If you
> feel Supervisor [] or Supervisor [] would be
> better, I understand. As Chief for close to
> two years at Union, it was my patience [sic]
> to forward a[n] email to Neil and my staff on
> my being out on leave. If you require me to
> communicat[e] with you before taking leave, I
> will ensure to reach out and ask before
> utilizing my PTO Sir, truly understand moving
> forward. All my assigned deliverables are
> scheduled to be forwarded on time.

(ECF No. 73-10, at 2). Lydia Darby ("Ms. Darby"), a Manager of the Security Department, states that "[t]he appointment to Interim Chief of Security came as a complete surprise to me as I had been serving as a night shift supervisor for approximately 3 years and this new, added role would impact my schedule." (ECF No. 73-25, at 3).

Plaintiff applied for leave under the FMLA through Defendants' partner Matrix on October 7, 2020. (ECF Nos. 68-1, at 19; 73-11, at 2). Matrix provided Plaintiff paperwork, including a form to be signed by Plaintiff's healthcare provider, which were due within 15 days. (ECF No. 73-12). When Plaintiff missed that deadline, he was given multiple extensions, but never returned the paperwork. (ECF Nos. 68-1, at 19, 22; 73-13, at 2; 73-14, at 2; 73-26).

Plaintiff had a doctor's appointment on October 20, 2020, where he received diagnoses including anxiety, obesity, depression, uncontrolled hypertension, unspecified headache, and snoring. (ECF No. 73-24, at 5-6). He had a second doctor's appointment on October 28, 2020. (*Id.* at 3). He also saw Dr. Roshanda Shoulders, Ph.D., LCSW-C ("Dr. Shoulders"), a social worker, on six occasions between November 4, 2020 and December 7, 2020. (ECF No. 73-34, at 2). Plaintiff did not ask Dr. Shoulders to provide any FMLA forms. (*Id.* at 3).

On October 26, 2020, before Plaintiff had received a decision on his request for FMLA leave and before he returned to work, Mr. Cawley called him to terminate his employment, effective November 7, 2020. (ECF No. 72-6, at 8). Lindsay Layman ("Ms. Layman"), the Director of Human Resources, emailed Plaintiff a copy of his separation agreement later that day. (ECF No. 73-16). Defendants assert that Plaintiff's employment was terminated due to his "performance, time and attendance, leadership style[,] and adherence to the MedStar SPIRIT values[,]" (ECF No. 72-15, at 2), while Plaintiff asserts that he was "informed that MedStar was doing away with Chief of Security titles and replacing them with the titles Directors of Security" and that "MedStar has decided not to offer Plaintiff the new role as Director of Security[,]" (ECF No. 81, at 12). Plaintiff argues that "[n]either Mr. Cawley [nor] Ms. Layman mentioned any issue(s) or [p]roblems with

12

Plaintiff['s] work performance and/or attendance[.]" (ECF no. 81, at 12).

On December 13, 2020, Plaintiff filed a charge of discrimination against Defendants. (ECF No. 73-23). On October 17, 2022, Plaintiff filed a complaint against Defendants. (ECF No. 1). Defendants filed an answer on November 28, 2022. (ECF No. 8). On June 6, 2023, Defendants filed a stipulated confidentiality order, (ECF No. 22), which the court approved on June 7, 2023, (ECF No. 23). On September 18, 2023, Plaintiff filed a motion for summary judgment. (ECF No. 68). On September 19, 2023, Plaintiff filed a supplemental exhibit to his motion. (ECF No. 70). On September 25, 2023, Defendants filed a motion to dismiss or, in the alternative, cross-motion for summary judgment; a motion to seal various exhibits in support of the motion; and unredacted versions of the exhibits under seal. (ECF Nos. 71-73). A Rule 12/56 notice was sent to Plaintiff on September 26, 2023. (ECF No. 74). Defendants filed a response in opposition to Plaintiff's motion for summary judgment on October 2, 2023. (ECF No. 75).

Plaintiff filed a notice of filing a declaration and exhibit on October 24, 2023, (ECF No. 76), and a second notice on October 29, 2023, (ECF No. 78). The two versions are identical except the second filing contains what appears to be Plaintiff's signature on the last page. Also on October 24, 2023, Plaintiff filed a motion

to quash/dismiss Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment. (ECF No. 77). On November 6, 2023, Defendants filed a reply to their motion to dismiss or, in the alternative, cross-motion for summary judgment. (ECF No. 79).

On November 6, 2023, Plaintiff filed correspondence to the court explaining that he "submitted in error documents on top of each other which erased the previous document, leaving only the last document filed which was [his] last exhibit 26[,]" and requesting that the court "review [his] full evidence[.]"[1]  (ECF No. 80).  That same day, Plaintiff also filed a response in opposition to Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment.[2]  (ECF No. 81).  On November 7, 2023, Plaintiff filed supplemental exhibits to his opposition. (ECF No. 82).  On November 8, 2023, Plaintiff filed an additional response to Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment.  (ECF No. 83).  On November 15, 2023, Defendants filed a motion to strike Plaintiff's correspondence, response in opposition, supplement, and second

---

[1] Plaintiff appears to refer to ECF Nos. 76 and 78, which contain an exhibit entitled "Exhibit 26."

[2] Plaintiff's opposition was due on October 24, 2023.  (ECF No. 74).  Thus, Plaintiff's response in opposition was not timely filed.

response.  (ECF No. 84).  On November 17, 2023, Plaintiff filed a response in opposition to Defendants' motion to strike.  (ECF No. 85).  On April 22, 2024, Plaintiff filed a correspondence inquiring if the court has made a decision in the case.  (ECF No. 86).

## II. Motion to Dismiss

Defendants filed a motion to dismiss the complaint based on fraud or spoliation or, in the alternative, a cross-motion for summary judgment.  (ECF No. 72).  They argue that dismissal is an appropriate sanction because: (1) Plaintiff concealed and misrepresented information related to his past and current employment throughout the course of discovery; and (2) Plaintiff admitted that he lost, misplaced, or destroyed relevant, discoverable material since initiating the litigation.  (ECF No. 72-2, at 21-27).

Defendants provide three instances in which Plaintiff allegedly lied throughout the litigation.  First, in their written discovery requests, Defendants asked Plaintiff to identify each person or entity for whom Plaintiff was employed before, during, and after his employment with Defendants, and all income or other earnings he has received from the start of his employment with Defendant until the present.  (ECF No. 73-17, at 12, 14).  Plaintiff provided no response as to the people or entities for whom he was employed before and during his employment with

Defendants, and stated that he has not been employed since his termination. (ECF No. 73-17, at 13-15). Defendants assert that they discovered that Plaintiff operated his own business before, during, and after his employment with Defendants, and that Plaintiff admitted during his deposition that he was employed full-time by another security company during and after his employment with Defendants. (ECF Nos. 72-2, at 23; 72-8, at 28-29, 34-37; 73-18; 73-19; 73-21). Second, Defendants argue that Plaintiff's representation that he was unable to request that a healthcare provider complete his FMLA paperwork because he went on leave early in the pandemic is false. (ECF No. 72-2, at 24). They assert that Plaintiff had in-person healthcare appointments in October 2020 but made no request for FMLA paperwork at the appointments, and that he asked his friend, Dr. Raquel Gordon, to complete FMLA paperwork for him but she refused. (ECF Nos. 72-2, at 24; 72-8, at 23-24; 72-31, at 3-4; 73-24). Finally, Defendants argue that Plaintiff admitted in his deposition that he lied on a job application he submitted after his termination. (ECF Nos. 72-2, at 24-25; 72-8, at 30-33, 38-42).

When exercising its power to dismiss as a sanction, a court must consider:

> (1) the degree of the wrongdoer's culpability;
> (2) the extent of the client's blameworthiness
> if the wrongful conduct is committed by its
> attorney, recognizing that we seldom dismiss
> claims against blameless clients; (3) the

> prejudice to the judicial process and the
> administration of justice; (4) the prejudice
> to the victim; (5) the availability of other
> sanctions to rectify the wrong by punishing
> culpable persons, compensating harmed
> persons, and deterring similar conduct in the
> future; and (6) the public interest.

*Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 226 (4th Cir.

2019) (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450,

462-63 (4th Cir. 1993)).

Defendants appear to be correct that Plaintiff made false

statements during the course of this litigation.  His degree of

culpability and blameworthiness is relatively high because he was

in the best position to know his employment and healthcare status.

Plaintiff's misrepresentations, however, have not prejudiced the

judicial process or administration of justice, and Defendants do

not explain whether or how they have been prejudiced, or how the

public interest would be harmed.  Less drastic sanctions are

available because as will be explained, Defendants' motion for

summary judgment will be granted.  Thus, dismissal based on fraud

is not necessary.

Nor will the complaint be dismissed based on spoliation of

evidence.  A party seeking spoliation sanctions must prove:

> (1) the party having control over the evidence
> had an obligation to preserve it when it was
> destroyed or altered; (2) the destruction or
> loss was accompanied by a culpable state of
> mind; and (3) the evidence that was destroyed
> or altered was relevant to the claims or
> defenses of the party that sought the

17

> discovery of the spoliated evidence, to the
> extent that a reasonable factfinder could
> conclude that the lost evidence would have
> supported the claims or defenses of the party
> that sought it.

*Membreno v. Atlanta Rest. Partners, LLC*, 338 F.R.D. 66, 71 (D.Md. 2021); *see also Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F.Supp.2d 673, 678 (D.Md. 2012); *Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d 494, 509 (D.Md. 2009).

"The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001).  Thus, Plaintiff's duty to preserve evidence arose when he filed a charge of discrimination against Defendants on December 13, 2020.  In response to Defendants' motion to compel, Plaintiff stated that he had not produced certain documents because "[a] lot of financial and other documents/records were lost/damaged and/or inadvertently discarded between summer 2020 and the fall of 2021 covid shutdown and my eviction force move June and July of 2023."  (ECF No. 39, at 2; *see also* ECF No. 73-20, at 3 ("[A] lot of my documents and a lot of my records and through my transition what I have provided to your law firm has been either misplaced and lost or -- or scattered throughout storages and family.")).

Even if Plaintiff breached his duty to preserve evidence, Defendants have not demonstrated that Plaintiff did so with a culpable state of mind.  To the contrary, Plaintiff's statements that evidence was lost when he was evicted and put his belongings in storage indicate that the loss was not purposeful. Consequently, Defendants' motion to dismiss based on fraud or spoliation of evidence will be denied.

## III. Motions for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court of the United States explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

19

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.  *See Liberty Lobby*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Greer v. Trinity Fin. Servs., LLC*, 607 F.Supp.3d 635, 640 (D.Md. 2022) (citing *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330 (4th Cir. 1998)); *see also Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).  Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *See Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

When faced with cross-motions for summary judgment, "the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th

Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).  In doing so, it must "take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion."  *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

**B. Analysis**

Plaintiff brings the following claims against Defendants:

1) FAMILY AND MEDICAL LEAVE ACT (Interference; Discrimination / Retaliation)
2) RACE DISCRIMINATION - TITLE VII (Discrimination in the Terms, Conditions, and Discharge of Employment)
3) ADA (Failure to Reasonably Accommodate and Wrongful Termination)
4) TITLE VII- RETALIATION
5) TITLE 20- RETALIATION
6) TITLE 20- DISABILITY DISCRIMINATION
7) TITLE 20- RACE DISCRIMINATION
8) ADA HOSTILE WORKING ENVIRONMENT
9) TITLE VII HOSTILE WORKING ENVIRONMENT
10) TITLE 20- HOSTILE WORKING ENVIRONMENT (Disability and Race / Color)

(ECF No. 1, at 20-29).

Plaintiff's motion for summary judgment consists of a copy of his complaint (with four modifications); a chart in which he states that he moves for summary judgment on Counts I, VII, and VIII and indicates which exhibits support each of the three counts; and eleven exhibits.  (ECF No. 68).  Plaintiff modified the complaint in his motion by:

> 1) Adding a title: "Memorandum of Points and Authorities in Support of Motion for Summary Judgment[,]" which is located above the "FACTS" section;
>
> 2) Adding a statement following the paragraphs under COUNT ONE FAMILY AND MEDICAL LEAVE ACT (Interference; Discrimination / Retaliation): "The FMLA document from MedStar Matrix reporting system addressed to Covington See Exhibit (2) & (3) to the Covington Affidavit.";
>
> 3) Adding a statement following the paragraphs under COUNT THREE ADA (Failure to Reasonably Accommodate and Wrongful Termination): "The FMLA document from reporting system to Covington See Exhibit (5) to the Covington Affidavit."; and
>
> 4) Adding a conclusion: "For the foregoing reasons, and those set forth in plaintiffs' prior submissions, the plaintiffs' motion for summary judgment should be granted. Therefore, the Court should enter an order declaring that 2 U.S.C. § 441c as applied to plaintiffs violates the First Amendment and the Equal Protection component of the Fifth Amendment and enjoining defendant from enforcing section 441c against plaintiffs."

(ECF No. 68, at 5, 23, 25, 31).  In the chart, Plaintiff asserts that Exhibits 1 through 5 support his motion for summary judgment on Count VII, Exhibits 6 through 8 support his motion on Count I, and Exhibits 9 through 11 support his motion on Count VIII.  (ECF No. 68, at 32-33).  The exhibits attached to his motion contain:

> 1) A September 30, 2020 email from Mr. Cawley to Plaintiff addressing a Security Leadership Meeting that Mr. Cawley observed.  Mr. Cawley writes, "In response to your team[']s concerns and pushback it was not appropriate for you to shift the focus and volunteer the private call you had with [] wherein you reported to your

team that you were asked to accommodate 'favoritism' from [] as it related to a physician who parked in the front circle nor blame HR/recruiting for the perceived delays in posting open positions . . . You came to me a few weeks ago to voice your displeasure with the comments in your annual performance review that Neil MacDonald made about your leadership style of "managing up" difficult decisions and "delegating out" your duties to your support staff.  I committed to investing in your success and highlighting if/when this counterproductive leadership style happens. Today was one of those instances of managing up difficult decisions.  As a leader you need to be positive, professional and balanced when faced with challenging topics from your team coupled with always representing the MedStar Health SPIRIT values.";

2) A document of minutes from a meeting prepared by Ms. Oakley Anderson;

3) A Session Detail Report that identifies a scheduled meeting between Plaintiff, Ms. Oakley Anderson, and Mr. Cawley on September 30, 2020;

4) An August 24, 2020 email thread between Plaintiff and presumably Security Department members wherein Plaintiff requests that an officer create a temporary schedule;

5) Four email threads.  The first is an April 16, 2020 thread between Plaintiff, Mr. MacDonald, and others in which Mr. MacDonald writes, "Larry – Eddie met with your team and explained to them why the[y] do not need N95 masks....they are behind plexiglass and have surgical masks that protect them.  They need to stop requesting them....Mike needs the masks back that they were given....we need them for nurses who are caring for Covid Positive patients[,]" and Plaintiff responds, "I have retrieved the masks from security."  The second is an April 20, 2020 email from Mr. MacDonald to Mr. Pallozzi, Plaintiff, and others in

which Mr. MacDonald writes, in relevant part, "Bill there seems to be some confusion among the Security Staff around the PPE they are supposed to be wearing when going into Covid Positive or PUI patient Rooms to restraint patients.  Unless I heard Dr. Fairbanks wrong this morning, there is NO need for them to wear N95 masks while helping to apply restraints.  It is not considered an aerosolizing procedure.  They need to gown, glove and wear a surgical mask."  The third is a March 16, 2020 thread between Plaintiff and Mr. MacDonald in which Plaintiff writes, "please see below message from staff[;]" Ms. Darby responds, "Thank you![;]" Mr. MacDonald responds, "Staff would wear masks only when we get to phase III of the Emergency Response Plan. Wearing a mask around the campus is more dangerous than not wearing one[;]" and Plaintiff responds, "Ok, thanks."  The fourth is an October 8, 2020 thread between Plaintiff, Mr. Johnson, Mr. MacDonald, and others in which Plaintiff provides instructions on "protocols until The Symmetry System (cameras/panic buttons) servers are back online[;]" Mr. Johnson replies, "No they will not use the notification template as that was inadequate and only created more questions from staff.  You will need to build a new notification template that meets the needs requested by the workplace violence committee last month and outline specifically in the risk assessment that was sent out yesterday.  The email that was sent out this morning will be addressed during our WPV meeting to ease concerns that it has caused[;]" and Plaintiff responds, in relevant part, "Eddie, what questions?";

6) Plaintiff's separation agreement and general release letter dated October 26, 2020;

7) A letter from Matrix to Plaintiff dated October 9, 2020 stating that his FMLA leave starts on 10/7/2020, that he is eligible for 12 weeks under the FMLA, and that he

> needs to have his health care provider
> complete a form within 15 days and return
> it to Matrix;
>
> 8) A November 9, 2020 email from Matrix to
> Plaintiff stating, "There has been a
> misunderstanding on claims examiners. Your
> leave is pending 10/7/2020 to 10/27/2020.
> Can you please advise if you returned back
> to work? If you are still out please advise
> an estimate date of returning?  Also the
> extension dates is granted.";
>
> 9) Plaintiff's performance review for July
> 2019 through June 2020;
>
> 10)  A picture of a Facebook page containing
> the Mr. Hankey the Christmas Poo meme and
> screenshots of Plaintiff's text messages
> with Mr. Johnson related to the same; and
>
> 11)  The front page of two articles, one
> entitled "When Black Children Were Farmed
> Out to White Families," and the other
> entitled "'Farmed' out to a white family, I
> became a skinhead:  Adewale Akinnuoye-
> Agbaje on his first film."  This exhibit
> also contains an email thread between
> Plaintiff, Mr. MacDonald, and Ms. Handwerk
> in which Plaintiff forwards an email from
> one of his team members regarding a nurse
> using a racial slur and Ms. Handwerk replies
> asking an HR team member to take a look.

(ECF No. 68-1).  Plaintiff does not explain how the exhibits

support his motion.

In Defendants' cross-motion for summary judgment, brought in

the alternative to their motion to dismiss, they argue that:  (1)

Plaintiff failed to establish a prima facie case of FMLA

interference, meaning Count I fails as a matter of law; (2)

Plaintiff produced no evidence that he was disabled under the

Americans with Disabilities Act ("ADA") and Title 20 of the

Maryland Fair Employment Practices Act ("MFEPA"), meaning his

failure to accommodate (Count III), discrimination (Count VI), and hostile work environment (Counts VIII and X) claims fail as a matter of law; (3) Plaintiff failed to produce evidence that he was discriminated against or subjected to a hostile work environment based on his race, meaning his raced-based discrimination (Counts II and VII) and hostile work environment (Counts IX and X) claims fail as a matter of law; (4) Plaintiff failed to produce evidence of retaliation, meaning his retaliation claims under the FMLA (Count I), Title VII of the Civil Rights Act of 1964 (Count IV), Title 20 of the MFEPA (Count V), and ADA (Count III) fail as a matter of law; (5) even assuming Plaintiff had established prima facie cases of discrimination and retaliation under any statute, his claims still fail because he has produced no evidence to rebut Defendants' legitimate, nondiscriminatory, and nonretaliatory reasons for his termination; and (6) Plaintiff's self-serving, unsupported assertions of discrimination and retaliation are not sufficient to withstand summary judgment. (ECF No. 72, at 28-59).

Plaintiff and Defendants attach several exhibits to their motions. For each of his exhibits, Plaintiff includes a declaration "under penalty of perjury . . . that the foregoing is true and correct." (ECF No. 68-1, at 1, 3, 5, 7, 9, 14, 18, 21, 23, 36, 40). Defendants do not include a declaration or affidavit authenticating their exhibits, apart from the deposition

transcripts and affidavits of Mr. Johnson, Mr. Cawley, Mr. Clark, Ms. Darby, and Dr. Shoulders.  The court may still consider the exhibits, however, because "facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form."  *Nordman v. Tadjer-Cohen-Edelson Assocs., Inc.*, No. 21-cv-1818-DKC, 2024 WL 895122, at *8 (D.Md. Mar. 1, 2024) (quoting *Wake v. Nat'l R.R. Passenger, Corp.*, No. 12-cv-1510-PWG, 2013 WL 5423978, at *1 (D.Md. Sept. 26, 2013)), *reconsideration denied*, No. 21-cv-1818-DKC, 2024 WL 1513522 (D.Md. Apr. 8, 2024).

The parties would be able to provide admissible versions of their documents at trial.  The authors of the emails and text messages, meeting minutes, performance review, chief of security job description, summary of performance deficiencies, Matrix letters, separation agreement, invoices, charge of discrimination, Vie Management application, and chart identifying Plaintiff's inconsistent statements would be able to authenticate the documents by testifying as to their personal knowledge of writing them.  Fed.R.Evid. 901(b)(1).  The session detail report, Model City payments, Vie Management pay summaries and earnings statements, Planned Parenthood application package, and medical records could "be admissible if they were accompanied by an affidavit from the custodian of the records to authenticate the records and establish that they were kept in the course of regular

business." *Nordman*, 2024 WL 895122, at *9 (quoting *Jones v. W. Tidewater Reg'l Jail*, 187 F.Supp.3d 648, 654 (E.D.Va. 2016)). Plaintiff's former attorneys,[3] who prepared his responses to requests for documents and answers to Defendants' interrogatories, can authenticate those documents because the "declaration of an attorney is sufficient to authenticate . . . discovery documents, such as answers to deposition questions, interrogatories or requests for admissions." *Nordman*, 2024 WL 895122, at *9 (quoting *Deakins v. Pack*, 957 F.Supp.2d 703, 754 (S.D.W.Va. 2013)). Finally, the court can consider the article entitled "When Black Children Were Farmed Out to White Families" because both Plaintiff and Defendants included the same document in their motions. (ECF Nos. 68-1, at 41-43; 73-31); *see also Nordman*, 2024 WL 895122, at *9 (citing *Ridgell v. Astrue*, No. 10-cv-3280-DKC, 2012 WL 707008, at *10 (D.Md. Mar. 2, 2012)) "Where [Plaintiff] relies on Defendant's exhibits . . . she has likely waived her hearsay objection to those particular exhibits.").

### 1. **FMLA Interference Claim (Count I)**

In Count I, Plaintiff alleges that Defendants engaged in interference under the FMLA by terminating his employment before

---

[3] Plaintiff had retained counsel at the beginning of the litigation. For instance, his complaint, responses to requests for documents, and answers to interrogatories were drafted by counsel. His counsel later withdrew, and he is now proceeding pro se. (ECF Nos. 16; 17).

a determination had been made on his use of FMLA leave.  (ECF No. 1 ¶¶ 109-117).  In his motion for summary judgment, Plaintiff asserts that his separation agreement, Matrix letter instructing him to have his healthcare provider submit a certification form, and Matrix email granting his extension request support his motion on Count I.  (ECF No. 68, at 32).  In Defendants' cross-motion, they argue that: (1) Plaintiff was not entitled to an FMLA benefit because he did not have a serious health condition and did not provide adequate notice about his need for leave; and (2) Plaintiff failed to prove that his termination constituted interference. (ECF No. 72-2, at 29-32).

"[T]o make out an FMLA interference claim, an employee must demonstrate (1) that he is entitled to an FMLA benefit; (2) that his employer interfered with the provision of that benefit; and (3) that the interference caused him harm."  *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 796 (4th Cir. 2023) (citing *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015)), *cert. denied sub nom. Baker v. CSX Transp., Inc.*, 144 S.Ct. 825, 218 L.Ed. 2d 32 (2024).  An employee is entitled to an FMLA benefit if he or she has "a *serious health condition* and [provides] *adequate communication*, meaning a timely communication sufficient to put an employer on notice that the protections of the Act may apply." *Brushwood v. Wachovia Bank, N.A.*, 520 F.App'x 154, 157 (4th Cir.

2013) (quoting *Rodriguez v. Smithfield Packing CO., Inc.*, 545 F.Supp.2d 508, 515-16 (D.Md. 2008)).

A "serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider[.]" 29 C.F.R. § 825.113(a). The term "continuing treatment by a health care provider" means "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition[.]" 29 C.F.R. § 825.102. "The term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). An employer has discretion to require that an employee's leave request "be supported by a certification issued by the health care provider of the ... employee[.]" 29 U.S.C. § 2613(a).

Here, Plaintiff has not provided evidence showing that he was entitled to an FMLA benefit. Although he proffers medical records showing that he received diagnoses of anxiety, obesity, depression, uncontrolled hypertension, unspecified headache, and snoring, (ECF No. 82-15, at 18-19), none of his exhibits indicate that his diagnoses incapacitated him for more than three consecutive days. Nor does he provide evidence that any healthcare

provider recommended that he take leave or that he was undergoing treatment prior to the start of his leave. Moreover, it is undisputed that Defendants maintained a policy of requiring an employee to submit a certification issued by a healthcare provider in order to take FMLA leave. (ECF Nos. 68-1, at 19; 72-6, at 8; 73-12, at 2). Plaintiff's medical records provide no indication that he asked his healthcare providers to complete an FLSA certification or that they indeed completed such a certification. (ECF No. 82-15). Because Plaintiff has not demonstrated that he was entitled to an FMLA benefit, his motion for summary judgment will be denied as to the portion of Count I alleging FMLA interference.

Defendants, for their part, filed an email from their Leave of Absence Coordinator stating that Plaintiff's request for leave was denied because "[p]er Matrix, there was no medical certification received to approve the claim after multiple attempts to obtain[.]" (ECF No. 73-26, at 2). Additionally, Defendants have provided an affidavit from Dr. Shoulders, who attests that Plaintiff had six appointments with her between November 4, 2020 and December 7, 2020, but never once provided her with or requested that she complete any FMLA form. (ECF No. 73-34; at 2-3). Finally, Defendants proffered pay summaries and earning statements indicating that Plaintiff worked full-time for Vie Management during his leave. (ECF No. 73-21, at 15; 38-41).

Although Plaintiff appears to have suffered from physical and mental health conditions, nothing in the record indicates that he had an injury, illness, impairment, or condition that required care involving a period of incapacity of more than three consecutive days, or rendered him unable to work or perform regular daily activities. C.F.R. § 825.102(a); C.F.R. § 825.113(a) & (b). Even construing the facts in the light most favorable to Plaintiff, Defendant has demonstrated that Plaintiff did not have a serious health condition for purposes of FMLA leave.

Defendants also argue that Plaintiff did not provide them with notice of his leave. For an employee to be eligible or entitled to leave, the employee must notify their employer of the need for leave. 29 C.F.R. § 825.301(b). An employee "shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). Furthermore, even "[w]hen the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c). Where an employee fails to do so, "FMLA-protected leave may be delayed or denied." *Id.*

In his affidavit, Mr. Cawley states that "MedStar policy requires that an employee coordinate his need for leave with his supervisor prior to taking the leave. And in the case of the Chief

of Security, an employee must coordinate with his supervisor to determine who will serve in his role while he is out of work[.]" (ECF No. 72-6, at 8).  Plaintiff does not dispute that Defendants maintained this policy.  On October 5, 2020, Plaintiff sent Mr. Pallozzi a text message stating that he "will be submitting three weeks of leave of absence today[.]"  (ECF Nos. 72-2, at 20; 73-9, at 2-3).  Later that day, Plaintiff emailed Mr. Pallozzi, Mr. Cawley, Mr. Clark, and others that he will "be on needed PTO from 10/06/2020 until 10/20/2020" due to "medical reasons[.]"  (ECF No. 73-8, at 2).  Mr. Cawley responded that "[t]his is the first I am learning of your leave[,]" (ECF No. 73-10, at 2), and attested in his affidavit that "[p]rior to that October 5, 2020 e-mail, Mr. Covington never indicated to me that he will be taking time off[,]" (ECF No. 72-6, at 8).

Even considering the facts in the light most favorable to Plaintiff, Defendants have demonstrated that by failing to coordinate his leave and appointment of an interim Chief of Security with his supervisor prior to making his request, Plaintiff did not comply with Defendants' usual and customary notice and procedural requirements for requesting leave.  29 C.F.R. § 825.303(c).

Finally, Defendants argue that even if Plaintiff was entitled to FMLA benefits, he has not proven that his termination constituted interference.  (ECF No. 72-2, at 32-34).  "'Because

the FMLA grants valuable leave and restoration rights to eligible employees,' it also secures these rights by making it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under' the FMLA[.]" *Hannah P. v. Haines*, 80 F.4th 236, 244 (4th Cir. 2023) (first quoting *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005); then quoting 29 U.S.C. § 2615(a)(1)).  To succeed on an interference claim,

> [a]n employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights.  Even then, § 2617 provides no relief unless the employee has been prejudiced by the violation:  The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).

*Id.* (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).  "In FMLA interference cases where the alleged injury involves an adverse employment action, 'an employer may avoid liability if it shows it would have taken the contested adverse employment action regardless of the employee's FMLA leave.'"  *Id.* (quoting *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732–33 (4th Cir. 2022)).  Thus, an employee bears the initial burden of "prov[ing] that an employer's FMLA interference caused the alleged

adverse employment action[.]" *Id.* Next, "the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the action taken." *Id.* Finally, the burden shifts back to the employee, who "retains the ultimate burden of proof to demonstrate that the employer's actions did, in fact, interfere with the employee's FMLA rights and directly cause the alleged harm." *Id.*

Plaintiff alleges that his termination while his leave request was still pending constituted an adverse employment action and that "Defendants interfered with his leave[.]" (ECF No. 1 ¶ 113-114). He does not allege specifically how Defendants interfered with his leave, but it appears that he is arguing that his termination constituted both the adverse employment action and the interference. Plaintiff's exhibits that are potentially relevant to his interference claim include his separation agreement, Matrix letter explaining that he will be notified of a decision within five days of receipt of a completed certification form from a healthcare provider, Matrix email stating that his leave is pending 10/07/2020 to 10/27/2020 and granting his extension request, and performance review stating that "overall Larry has had a solid year from a leadership perspective." (ECF No. 68-1, at 15-17, 19, 22, 29).

Even if these exhibits satisfied Plaintiff's initial burden of proving that Defendants' alleged interference caused the adverse employment action—the termination—Defendants have met

their burden of providing a legitimate, nondiscriminatory reason
for the termination.  The United States Court of Appeals for the
Fourth Circuit has explained:

> The FMLA does not prevent "an employer from
> terminating an employee for poor performance,
> misconduct, or insubordinate behavior."
> *Vannoy v. Federal Reserve Bank of Richmond*,
> 827 F.3d 296, 304-05 (4th Cir. 2016).  And it
> is not the courts' place to determine whether
> [the employer's assessment of [the employee's]
> performance issues was "'wise, fair, or even
> correct, so long as it truly was the reason
> for [her] termination.'"  *Laing* [*v. Fed. Exp.
> Corp*.], 703 F.3d [713,] 722 [(4th Cir. 2013)]
> (citing *Hawkins* [*v. PepsiCo, Inc.*], 203 F.3d
> [274,] 279 [(4th Cir. 2000)]).  The FMLA does
> not require "an employer to retain an employee
> on FMLA leave when the employer would not have
> retained the employee had the employee not
> been on FMLA leave."  *Throneberry v. McGehee
> Desha County Hospital*, 403 F.3d 972, 977 (8th
> Cir. 2005).

*Fry v. Rand Constr. Corp.*, 964 F.3d 239, 249 (4th Cir. 2020).

Defendants have demonstrated that they "would have made the
same employment decision independent of the FMLA interference."
*Hannah P.*, 80 F.4th at 244.  Mr. Clark and Mr. Johnson attested
that Plaintiff often delegated his responsibilities to others.
(ECF Nos. 72-5, at 3-4; 72-7, at 3-4).  Mr. Johnson also attested
that Plaintiff was unable to handle his assigned tasks and was
often unreachable.  (ECF No. 72-5, at 3-5).  Mr. Cawley attested
that he had significant concerns with Plaintiff's performance and
attendance issues culminating in an attendance investigation
showing that Plaintiff was chronically absent, a meeting with

Plaintiff about the deficiencies in his Department, and communication with management about how to address the issues, including by terminating his employment. (ECF No. 72-6, at 4-8; *see also* ECF Nos. 73-1, at 2; 73-2, at 2-3; 73-3, at 2-4; 73-6, at 2).

Plaintiff himself admitted in his deposition that he often did not use the walkie-talkie Defendants had provided to him to communicate with his colleagues. (ECF No. 72-8, at 5). He also admitted that after his October 2, 2020 meeting with Mr. Cawley and Mr. Johnson, he did not provide Mr. Cawley a status update because:

> I don't report to Eddie Johnson and if there is something need to be done for -- security-wise, I have no problem providing that. The information – the things that Eddie Johnson asked for, he didn't ask for it to go to Mr. Cawley, he asked for it to go to him. And I was not going to forward him information because I don't report to Eddie Johnson.

(ECF No. 72-8, at 20).

Defendants have provided ample evidence that they would have terminated Plaintiff for performance and attendance issues independent of any FMLA interference. *Hannah P.*, 80 F.4th at 244. Accordingly, the burden shifts back to Plaintiff to prove that Defendants' actions did, in fact, interfere with his FMLA rights and directly cause the alleged harm. *Id.* Plaintiff has not begun to explain how he can satisfy this burden.

Because Defendants have established that Plaintiff did not have a serious medical condition and did not provide adequate notice to Defendants, Plaintiff cannot demonstrate that he was entitled to an FMLA benefit. *Brushwood*, 520 F.App'x at 157 (quoting *Rodriguez*, 545 F.Supp.2d at 515-16). Additionally, Defendants have demonstrated that their termination did not constitute interference because they terminated Plaintiff for legitimate reasons—his attendance and performance issues. Defendants' motion for cross summary judgment will therefore be granted as to the portion of Count I alleging FMLA interference.

### 2. Disability-Based Failure to Accommodate, Discrimination, and Hostile Work Environment Claims (Counts III, VI, VIII, and X)

Plaintiff advances multiple disability-based claims. In Count III, he alleges that Defendants failed to provide reasonable accommodations and wrongfully terminated his employment in violation of the ADA. (ECF No. 1 ¶¶ 121-128). In Count VI, he alleges that Defendants discriminated against him on the basis of disability in violation of the MFEPA. (ECF No. 1 ¶¶ 139-141). In Count VIII, he alleges that Defendants subjected him to a hostile work environment on the basis of disability in violation of the ADA. (ECF No. 1 ¶¶ 145-148). In Count X, he alleges that Defendants subjected him to a hostile work environment on the basis of disability in violation of the MFEPA. (ECF No. 1 ¶¶ 153-156).

Plaintiff moves for summary judgment on Count VIII. (ECF No. 68, at 32). He asserts that an April 16, 2020 email from Mr. Johnson to him; August 24, 2020 emails between him and a member of his Department; September 30, 2020 email from Mr. Cawley to him; and minutes and session detail report from a September 30, 2020 meeting support his motion on this claim. (*Id.*). Defendants argue that Counts III, VI, VIII, and X fail as a matter of law because Plaintiff produced no evidence that he was "disabled" under the ADA and MFEPA. (ECF No. 72-2, at 35-39). Defendants do not dispute that Plaintiff's conditions constitute impairments but argue that Plaintiff has not proven that their effects substantially limited his ability to perform a major life activity. (ECF No. 72-2, at 36).

The ADA and MFEPA prohibit employers from discriminating on the basis of disability. 42 U.S.C.A. § 12112(a); Md. Code Ann., State Gov't § 20-606(a), *amended by* Discrimination—Military Status—Prohibition, 2024 Maryland Laws Ch. 322 (H.B. 598). "The MFEPA contains functionally identical prohibitions and is evaluated under the same framework as the Americans with Disabilities Act[.]" *Teel v. Md. Nat. Treatment Sols., LLC*, No. 23-cv-1694-RDB, 2024 WL 1075421, at *4 (D.Md. Mar. 12, 2024) (citing *Miller v. Md. Dep't of Nat. Res.*, 813 F.App'x 869, 874 (4th Cir. 2020); *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 218-19 (Md. 2016)). To succeed on a claim for discrimination, wrongful

discharge, failure to accommodate, or hostile work environment under the ADA or MFEPA, a plaintiff must prove that he or she has a "disability." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (discrimination); *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (wrongful discharge); *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021) (failure to accommodate); *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 367 (4th Cir. 2022) (hostile work environment).

"Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C.A. § 12102(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102(2)(A). For a major life activity to be substantially limited, the impairment must

> substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).

Plaintiff alleges that he "suffered from anxiety, depression, insomnia disorder, hypertension, trauma, and related serious health conditions[]" and that "[t]hese conditions and impairments constituted disabilities, collectively and individually, which substantially limited one or more of [his] major life activities, including but not limited to concentrating, organizing, sleeping, eating, and responding to stress."  (ECF No. 1 ¶¶ 123-124).  He also alleges that he had a record of disabilities, and that Defendants regarded him as having disabilities.  (ECF No. 1 ¶ 125).

Plaintiff has not demonstrated that his impairments substantially limited a major life activity.  None the exhibits attached to his motion concern his impairments or how they affected him.  In the supplement to his opposition to Defendants' motion, Plaintiff attaches several exhibits that potentially relate to his impairments.  First, Plaintiff filed a document entitled "Calls made to Employee Assistance Program" that includes a list of thirteen dates on which Plaintiff purportedly called the program between September 26, 2020 and November 22, 2020.  (ECF No. 82-15, at 13).  Second, Tesa Brody-Wyre emailed Plaintiff on October 6, 2020 thanking him for chatting with her that day and providing counseling, psychiatry, and psychology contact information.  (ECF No. 82-15, at 12).  Third, Capital Cardiology Consultants emailed Plaintiff on October 6, 2020 confirming a doctor's appointment.

41

(ECF No. 82-15, at 15).  Fourth, Comprehensive Behavioral Health emailed Plaintiff on October 21, 2020 and November 1, 2020 confirming telepsychiatry appointments.  (ECF No. 82-15, at 9, 14).  Fifth, Plaintiff emailed Ms. Layman on November 2, 2020 stating, "My doctor [has] been treating/helping me get through another anxiety attack once again caused by Brian Cawley racial & hostile work environment actions towards me." (ECF No. 82-11, at 2).  Sixth, Doctors Community Practices Laurel provided a referral on November 4, 2020 "[f]or evaluation and treatment." (ECF No. 82-15, at 16).  Seventh, Dr. Shoulders prepared an undated document stating:

> I have been providing therapeutic services to Mr. Covington for the past month.  It is evident that Mr. Covington is suffering from severe anxiety, depression, and trauma due to a stressful work environment, systemic racism he has endured, CO[VI]D concerns, and life transitions.  Mr. Covington is not sleeping well, not eating properly, and is not mentally and physically functioning soundly because of his present life circumstances . . . It appears that [the] majority of his anxiety and depression issues are stemming from concerns related to his present employment.  Mr. Covington had done well for a few weeks in not communicating with anyone on the job and exercising more. Unfortunately, Mr. Covington communicated with his[]place of employment recently, which has caused a setback in his recovery.  Due to his setback in recovery, we are now going from one session to two session[s] a week to deal with his severe anxiety, depression[,] and trauma that he is suffering from.

(ECF No. 82-14, at 4).   Eighth, Plaintiff filed an undated memorandum entitled "SUMMARY OF ISSUES AND CONCERNS RE:   LARRY COVIGNTON AND RACISM, HOSTILE WORK ENVIRONMENTAND RETAILATION WITHIN UNION MEMORIAL HOSPITAL."   (ECF No. 82-17, at 2).   The memorandum is not signed but appears to have been written by Plaintiff.   It provides:

> The ongoing racism and hostile work environment became a daily occurrence and eventually took a toll on my physical and mental health examples:   (please see black face email and communication of Farming Out on my evaluations as two of many examples).   The disparity in treatment continued and eventually became overwhelming. On October 7, 2020 because I experienced what later was diagnosed as an anxiety attack[,] I contacted Medstar Occupational Health and immediately took a 3 week leave of absence to work on mental and physical health.   I applied for FMLA and was asked to provide medical documentation. I assigned leadership (Officer in Charge) to a supervisor and provided support and documentation for them to lead in my absence.   On the first day of my leave my subordinates noted the Safety Director, Edward Johnson, (Caucasian), stormed into my department and took leadership of the Security Department . . . This interaction caused chaos and confusion.   While I felt reluctant, I contacted and spoke with the Corporate executive over all of Medstar hospitals Security Departments, Vice President of Corporate Security, William Pallozzi, (Caucasian) and he noted he will speak with the Vice President of Union Memorial Hospital[,]   Mr. Brian Cawley, (Caucasian) concerning Edwards Johnson Safety Officer. This never occurred and they continued to cause chaos in the department . . . This interaction increased my stress and anxiety.

> I have always been a healthy person, but
> now, for the first time in my life I found
> myself meeting with cardiologists, case
> managers, psychiatrists and psychologists. I
> followed their care and treatment and was
> diagnosed with insomnia disorder, depression,
> anxiety, [and] uncontrolled hypertension
> . . . I informed the FMLA department, Matrix
> Absence Management, about my diligent
> appointments and noted the doctors needed one
> more appointment with me prior to my form
> being completed with a full medical assessment
> diagnosis. Prior to the due date of my FMLA
> paperwork, although still out on FMLA and
> resting at home in bed from the four
> medications prescribed by my doctors . . . [,]
> I received a call from my immediate supervisor
> Mr. Brian Cawley and HR Director, Linda
> Layman. Mr. Br[ia]n Cawley informed me that
> Union Memorial Hospital has decided to
> "separate and move in a different direction
> from me[.]"

(ECF No. 82-17, at 2-3).

Defendants also filed several exhibits indicating that Plaintiff suffered from impairments, but none indicates whether such impairments affected a major life activity. First, Plaintiff sent a text message to Mr. Pallozzi on October 5, 2020 stating that he contacted the Employees Assist program the previous night, did not sleep, is stressed, has high blood pressure, and will be requesting leave. (ECF No. 73-9, at 2-3). Second, Plaintiff sent an email to Mr. Pallozzi, Mr. Cawley, and others on October 5, 2020 stating that he will be taking leave. (ECF No. 73-8, at 2). Third, Plaintiff sent a second email to Mr. Cawley and Mr. Pallozzi on October 5, 2020 stating, "I stated because of Personal medical

reasons, I was utilizing PTO.  I never stated I was taking Medical leave or going out on FMLA."  (ECF No. 73-27, at 2).  Fourth, Plaintiff's Matrix claim for FMLA leave provides the following reasons for requesting leave:  "[v]ery stressed, unable to eat, sleep, nervous, anxious and having migraines[.]"  (ECF No. 73-12, at 5).  Fifth, Plaintiff's medical report provides that on October 20, 2020, he was diagnosed with uncontrolled hypertension, anxiety, depression, snoring, headache, and obesity.  (ECF No. 73-24, at 3, 5-6).  Sixth, in her affidavit, Dr. Shoulders states that she provided therapeutic services to Plaintiff on six occasions between November 4, 2020 and December 7, 2020.  (ECF No. 73-34, at 2).  Finally, Plaintiff's charge of discrimination provides, "On October 7, 2020, I made Respondent aware of my disability and took medical leave."  (ECF No. 73-23, at 3).

Plaintiff has not established that his impairments substantially limited his ability to engage in "concentrating, organizing, sleeping, eating, [or] responding to stress."  (ECF No. 1 ¶¶ 123-124).  That Plaintiff was experiencing anxiety and depression and was "not sleeping well, not eating properly, and [was] not mentally and physically functioning soundly because of his present life circumstances[,]" (ECF No. 82-14, at 4), is insufficient to establish that he was disabled, *see O'Malley v. Trader Joe's E., Inc.*, No. 19-cv-3273-RDB, 2020 WL 7398806, at *8 (D.Md. Dec. 17, 2020) ("[T]he fact that the Plaintiff suffered

stress and anxiety as a result of the particular circumstances related to her employment at Trader Joe's does not mean that the Plaintiff was disabled."); *Anderson v. Discovery Commc'ns, LLC*, 517 F.App'x 190, 195-96 (4th Cir. 2013) ("Sleep patterns vary between individuals and even during a person's lifetime, and on this record, Anderson simply failed to present evidence creating a genuine issue of material fact as to whether she was 'substantially impaired' in December 2006 as a result of her insomnia."), *as amended* (May 3, 2013); *Johnson v. Lexington Cnty. Sch. Dist. Two*, No. 3:15-cv-04807-JMC, 2019 WL 5542598, at *4 (D.S.C. Oct. 28, 2019) ("Although Johnson's treatment for anxiety and depression is documented, Johnson does not point to medical or even anecdotal evidence that the major life activities of sleeping and eating have been 'substantially limited.'").

Plaintiff does not allege that his impairments substantially limited his ability to work. Even if he had, there is nothing in the record that would support such an allegation. Nothing indicates that Plaintiff's performance and attendance issues were tied to his impairments. To the contrary, Plaintiff worked a second full-time security job while employed by Defendants and owned his own security business. (ECF Nos. 72-30; 73-18; 73-19; 73-21). No evidence suggests that Plaintiff's impairments substantially limited his work performance at other jobs or his ability to find a new job. (ECF No. 73-22).

46

Moreover, no evidence in the record indicates that Plaintiff informed Defendants that his impairments substantially limited any major life activities.  *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 179 (4th Cir. 2023) (affirming district court's grant of summary judgment to defendant where "no evidence indicates that [plaintiff] informed Gibbs or anyone else at SMC how these medical issues were significantly impairing her major life activities[]").  Indeed, there is no indication that Plaintiff informed Defendants that he had impairments at all until October 5, 2020, when he texted Mr. Pallozzi about his trouble sleeping, high blood pressure, and stress, and emailed his team stating he would be taking leave for medical reasons.  (ECF Nos. 73-8, at 2; 73-9, at 2-3).  He did not receive his diagnoses until October 20, 2020, (ECF No. 73-24, at 3, 5-6), and there is no indication that he informed Defendants of his diagnoses before he was terminated on October 26, 2020.  *See O'Malley*, 2020 WL 7398806, at *8 (granting Defendant's motion for summary judgment where, on the date that Defendants decided to terminate Plaintiff, "all the information the Defendant had with respect to the Plaintiff's health was that she felt unwell" and Plaintiff had not yet shared her diagnosis).  Because Plaintiff has not demonstrated that his impairments substantially limited his major life activities, he has failed to establish that he was actually disabled.

Next, Plaintiff has also failed to establish that there was a record of his impairment. "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1); *see also Kelly v. ACTS Ret.-Life Communities, Inc.*, No. 23-cv-127-GLR, 2023 WL 5721584, at *3 (D.Md. Sept. 5, 2023) (quoting *Parker v. Children's Nat'l Med. Ctr., Inc.*, No. 20-cv-3523-ELH, 2021 WL 5840949, at *14 (D.Md. Dec. 9, 2021)); *Foore v. City of Richmond, Va.*, 6 Fed. App'x 148, 153 (4th Cir. 2001).

There is no evidence that Plaintiff had a record of trouble sleeping, stress, or high blood pressure until October 5, 2020, when he disclosed those conditions to Mr. Pallozzi. (ECF No. 73-9, at 2-3). And there is no record that Plaintiff suffered from anxiety, depression, snoring, headache, or obesity until he received his diagnoses on October 20, 2020. (ECF No. 73-24, at 13-14). Plaintiff provides evidence that he called into the Employee Assistance Program starting on September 26, 2020, although there is no evidence about what was discussed on the calls. (ECF No. 82-15, at 13). Nothing in the record indicates that Plaintiff had any history of impairments before autumn 2020. Indeed, Plaintiff himself wrote, "I have always been a healthy person, but now, for the first time in my life I found myself meeting with cardiologists, case managers, psychiatrists and

psychologists.   I   followed   their   care   and   treatment   and   was diagnosed   with   insomnia   disorder,   depression,   anxiety,   [and] uncontrolled   hypertension[.]"   (ECF   No.   82-17,   at   2-3).   Nor   does any   evidence   suggest   that   Plaintiff's   impairments   had   a   record   of ever   substantially   limiting   his   ability   to   do   any   major   life activities.

Finally,   Plaintiff   has   failed   to   establish   that   Defendants regarded   him   as   having   an   impairment.   An   individual   is   "regarded as   having   such   an   impairment"   if   he   or   she   establishes   that   he   or she   has   been   perceived   as   having   an   impairment.   42   U.S.C.A. §   12102(3)(A).   "Put   simply,   even   if   an   individual   is   not   in   fact disabled,   if   his   employer   believes   otherwise,   then   the   individual is   protected   against   discrimination   on   account   of   the   employer's mistaken   belief."   *E.E.O.C.   v.   Optimal   Sols.   &   Techs.,   Inc.*,   422 F.Supp.3d   1037,   1045   (D.Md.   2019).   An   individual   cannot   be "regarded   as   having   an   impairment"   if   the   impairment   is   "transitory and   minor"   i.e.,   it   has   "an   actual   or   expected   duration   of   6   months or   less."   42   U.S.C.A.   §   12102(3)(B).

There   is   no   evidence   that   Defendants   knew   of   Plaintiff's impairments   until   he   texted   Mr.   Pallozzi   about   his   trouble sleeping,   stress,   and   high   blood   pressure.   (ECF   No.   73-9,   at   2-3).   Hypertension   is   not   considered   a   disability,   *see   Murphy   v. United   Parcel   Serv.,   Inc.*,   527   U.S.   516,   523-24   (1999);   *Stumbo   v. Dyncorp   Tech.   Servs.,   Inc.*,   130   F.Supp.2d   771,   773   (W.D.Va.),   *aff'd*

*sub nom. Stumbo v. Dyncorp Procurement Sys., Inc.*, 17 F.App'x 202 (4th Cir. 2001), and trouble sleeping and stress are "transitory and minor" conditions, 42 U.S.C.A. § 12102(3)(B). Even when Plaintiff notified his team that he was going to take leave for unspecified "medical reasons," there is no indication that Defendants were aware of Plaintiff's impairments or regarded him as having an impairment when they terminated his employment.

Because Plaintiff has not demonstrated that he had an actual impairment that substantially limited a major life activity, record of an impairment, or that Defendants regarded him as having an impairment, he has not established that he had a disability under the ADA and MFEPA. 42 U.S.C.A. § 12102(1). Hence, his motion for summary judgment on Count VIII will be denied. Because Plaintiff has not created a dispute of fact as to whether he has a disability, he cannot succeed on any of his disability-based claims, all of which require him to prove that he has a disability. Consequently, Defendants' motion for summary judgment will be granted as to Count III (failure to provide reasonable accommodations and wrongful termination in violation of the ADA), Count VI (discrimination on the basis of disability in violation of the MFEPA), Count VIII (hostile work environment on the basis of disability in violation of the ADA), and the portion of Count X alleging hostile work environment on the basis of disability in violation of the MFEPA.

3. **Race-Based Discrimination and Hostile Work Environment Claims (Counts II, VII, IX, and X)**

a. **Race-Based Discrimination Claims**

In Counts II and VII, Plaintiff alleges that Defendants discriminated against him on the basis of race in violation of Title VII and the MFEPA respectively. (ECF No. 1 ¶¶ 118-120, 142-144). Plaintiff moves for summary judgment on Count VII. (ECF No. 68, at 32-33). He argues that his performance review; picture of a Facebook page containing the Mr. Hankey the Christmas Poo meme; screenshots of his text messages with Mr. Johnson related to the meme; articles entitled "When Black Children Were Farmed Out to White Families" and "'Farmed' out to a white family, I became a skinhead: Adewale Akinnuoye-Agbaje on his first film"; and email chain in which Plaintiff forwards Ms. Handwerk a complaint from an employee in his Department regarding a nurse using a slur support his motion on this count. (*Id.*). In their cross-motion for summary judgment, Defendants assert that Plaintiff has failed to produce evidence necessary to establish a prima facie case of race-based discrimination. (ECF No. 72-2, at 39-41).

Title VII and the MFEPA prohibit employers from refusing to hire, discharging, or otherwise discriminating against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race. 42 U.S.C.A. § 12112(a); Md. Code Ann., State

Gov't § 20-606(a), *amended by* Discrimination—Military Status—
Prohibition, 2024 Maryland Laws Ch. 322 (H.B. 598).  These
provisions also prohibit employers from limiting, segregating, or
classifying employees in any way that would deprive the individual
of employment opportunities or otherwise adversely affect the
individual's status of an employee, because of the individual's
race.  *Id.*  Because the MFEPA is the state law analogue to Title
VII, courts apply the same standard in evaluating claims brought
under the MFEPA and Title VII.  *See Delarosa v. Comsource Mgmt.,
Inc.*, No. 20-cv-3174-GJH, 2021 WL 3857813, at *6 n.8 (D.Md. Aug.
30, 2021); *Martinez v. Bd. of Educ. of Prince George's Cnty.*,
No. 19-cv-0169-PJM, 2020 WL 4926610, at *4 (D.Md. Aug. 21, 2020)
(citing *McCleary-Evans v. Md. Dep't of Transp.*, No. 12-cv-1550-
ELH, 2015 WL 1285325, at *22 (D.Md. Mar. 20, 2015), *aff'd*, 631
F.App'x 178 (4th Cir. 2016); *Jones v. GT Contracting Corp.*, No. 14-
cv-3539-DKC, 2016 WL 704319, at *5 (D.Md. Feb. 23, 2016)).

Judge Hollander has outlined the methods by which a plaintiff
may establish a discrimination claim under Title VII:

> In general, at trial a plaintiff "may
> establish a discrimination claim under Title
> VII through two avenues of proof." *Thomas v.
> Delmarva Power & Light Co.*, 715 F.App'x 301,
> 302 (4th Cir. 2018) (per curiam) (citing *Hill
> v. Lockheed Martin Logistics Mgmt., Inc.*, 354
> F.3d 277, 284 (4th Cir. 2004) (en banc),
> *abrogated on other grounds by* [*Univ. of Texas
> Sw. Med. Ctr. v.*] *Nassar*, 570 U.S. 338, 133
> S.Ct. 2517, 186 L.Ed.2d 503).  The plaintiff's
> first avenue is to offer "'direct or

indirect'" evidence of discrimination under
"'ordinary principles of proof.'" *Burns v.
AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir.
1996) (citation omitted), *cert. denied*, 520
U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329
(1997); *see Thomas*, 715 F. App'x at 302.  The
plaintiff's second avenue is to follow the
burden-shifting approach first articulated by
the Supreme Court in *McDonnell Douglas Corp.
v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36
L.Ed.2d 668 (1973).  *See, e.g., Young v.
United Parcel Serv., Inc.*, 575 U.S. 206, 228-
29, 135 S.Ct. 1338, 191 L.Ed.2d 279 (2015)
(construing the Pregnancy Discrimination
Act); *Sempowich* [*v. Tactile Sys. Tech., Inc.*],
19 F.4th [643,] 649-50 [(4th Cir. 2021)]
(outlining the two approaches); *Guessous* [*v.
Fairview Prop. Invs., LLC*], 828 F.3d [208,]
216 [(4th Cir. 2016)] (discussing the *McDonell
Douglas* framework).

The *McDonnell Douglas* proof scheme is "a
procedural device, designed only to establish
an order of proof and production" at trial.
*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,
521, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)
(emphasis omitted).  It is intended to be
flexible, "not onerous," and is designed to
uncover "circumstances which give rise to an
inference of unlawful discrimination." *Texas
Dep't of Cmty. Affairs v. Burdine*, 450 U.S.
248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207
(1981).  However, "the *McDonnell Douglas* test
is inapplicable where the plaintiff presents
direct evidence of discrimination." *Trans
World Airlines, Inc. v. Thurston*, 469 U.S.
111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523
(1985).

Although the avenues of proof pertain to
trial, they are also relevant at the summary
judgment stage.  "To survive a motion for
summary judgment on a Title VII disparate
treatment claim, a plaintiff must either
proceed under the mixed-motive framework or
the *McDonnell Douglas* burden-shifting
framework." *Sempowich*, 19 F.4th at 649; *see
Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206
n.4 (4th Cir. 2019).  Reference to these

methodologies serves to inform a court's evaluation of a motion for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the framework established in *McDonnell Douglas Corp.*); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F.App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, 93 S.Ct. 1817, it "is 'not intended to be an inflexible rule.'" *Young*, 575 U.S. at 228, 135 S.Ct. 1338 (citation omitted). And, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

To establish a prima facie claim of discrimination under the burden-shifting framework set forth in *McDonnell Douglas*, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc.*,

*Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (citation omitted); *see also Sempowich*, 19 F.4th at 649-50; *Matias v. Elon Univ.*, 780 F.App'x 28, 31 (4th Cir. 2019).

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes*, 922 F.3d at 225; *see Sempowich*, 19 F.4th at 649-50. And, with regard to adverse action, it must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 n.8 (4th Cir. 2020)); *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Hurst v. District of Columbia*, 681 F.App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens— is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11, 113 S.Ct. 2742. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20, 113 S.Ct. 2742; *Adams v. Trs. of Univ. of North Carolina-Wilmington*,

640 F.3d 550, 560 (4th Cir. 2011) ("[I]n
demonstrating the Defendants' decision was
pretext, [plaintiff] had to prove 'both that
the reason was false, and that discrimination
was the real reason.'") (quoting *Jiminez v.
Mary Washington Coll.*, 57 F.3d 369, 378 (4th
Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not
submit evidence of a legitimate basis for its
actions, the factfinder may "infer
discriminatory animus because experience has
proved that in the absence of any other
explanation it is more likely than not that
those actions were bottomed on impermissible
considerations." *Furnco Const. Corp. v.
Waters*, 438 U.S. 567, 579-80, 98 S.Ct. 2943,
57 L.Ed.2d 957 (1978). And, if the defendant
fails to meet the burden of producing
"evidence which, taken as true, would permit
the conclusion that there was a
nondiscriminatory reason for the adverse
action," then "the court must award judgment
to the plaintiff as a matter of law." *St.
Mary's Honor Ctr.*, 509 U.S. at 509, 113 S.Ct.
2742 (emphasis in original). This is because
a legal presumption of intentional
discrimination has been established. *Id.* at
510, 113 S.Ct. 2742 n.3; *see Burdine*, 450 U.S.
at 255 n.8, 101 S.Ct. 1089 ("[T]he allocation
of burdens . . . is intended progressively to
sharpen the inquiry into the elusive factual
question of intentional discrimination.").

*Rodgers v. Eagle All.*, 586 F.Supp.3d 398, 433-34 (D.Md. 2022).

When a plaintiff alleges that the adverse employment action that

he or she experienced was discriminatory termination, he or she

must show that the employer "left open the position or replaced

the plaintiff with someone outside the protected class."

*Sempowich*, 19 F.4th at 649-50; *see also Purchase v. Astrue*, 324

F.App'x 239, 241 (4th Cir. 2009).

Plaintiff does not request to proceed by direct or indirect evidence of discrimination.  Under the direct and indirect evidence method of establishing discrimination,

> a plaintiff succeeds if he "demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir.[]2005) (internal quotation marks omitted).  The plaintiff may do so through direct or circumstantial evidence.  *Id.* at 318.  This evidence must both display a "discriminatory attitude" and bear a causal relationship with the adverse employment action. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir.[]2006).

*Ousley v. McDonald*, 648 F.App'x 346, 349 (4th Cir. 2016).

Here, "[t]he record reflects little, if any, "discriminatory attitude" toward [Plaintiff's] race."  *Id.*  The potentially relevant exhibits attached to Plaintiff's motion for summary judgment are:  (1) a December 23, 2019 email in which Mr. Handwerk stated that she has asked a member of the HR team to take a look after Plaintiff forwarded his employee's complaint about a nurse using a racial slur; (2) Plaintiff's September 22, 2020 performance review in which Mr. MacDonald stated that Plaintiff could improve by "Managing Up" less and not "farm[ing] out all the work[]" to his team; (3) a September 30, 2020 email in which Mr. Cawley offered feedback on Plaintiff's performance on a team call; (4) a session detail report displaying that Mr. Cawley attended the team call; (5) an October 8, 2020 email in which Mr. Johnson corrected

Plaintiff's instruction to his team; (6) a picture of and text message regarding the Mr. Hankey the Christmas Poo meme; and (7) articles entitled "When Black Children Were Farmed Out to White Families" and "'Farmed' out to a white family, I became a skinhead: Adewale Akinnuoye-Agbaje on his first film." (ECF No. 68-1, at 2, 6, 13, 29, 37-39, 41-44).

In his supplement to his opposition to Defendants' motion, Plaintiff also filed the following potentially relevant exhibits: (1) a December 21, 2019 email from a member of Plaintiff's Department reporting that a nurse used a racial slur; (2) a July 23, 2020 email in which Mr. Cawley asks Plaintiff for his "recommended solutions[]" and to "give some thought as to a proactive solution[]" regarding a team member who tested positive for COVID-19; (3) an October 8, 2020 email in which Mr. Johnson asks Plaintiff what the Security Department was doing to address an issue; (4) an October 14, 2020 email from Mr. Johnson expressing confusion as to why the Security Department had not submitted a report after an incident; (5) several emails Plaintiff received from colleagues praising his performance and that of his team; and (6) an undated memorandum in which Plaintiff states that he experienced racism and disparate treatment while working for Defendants. (ECF No. 82-17, at 2-3; 82-24, at 3; 82-25, at 3; 82-26, at 7, 10; 82-27, at 2-5, 7-13, 15-21).

None of these exhibits provide direct or indirect evidence of racial discrimination under the ordinary principles of proof. Therefore, to proceed, Plaintiff must satisfy his showing under the *McDonnell Douglas* framework.  It is undisputed that Plaintiff is Black and therefore a member of a protected class, and that he experienced the adverse employment action of termination.  The parties dispute whether Plaintiff's job performance was satisfactory and whether he received different treatment from similarly situated employees outside his protected class.

To show that his job performance was satisfactory at the time that Defendants terminated his employment, Plaintiff need not "show that he was a perfect or model employee." *Haynes*, 922 F.3d at 225.  Rather, he need only show "that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Id.* (citing *Warch*, 435 F.3d at 515–16).

Defendants argue that Plaintiff's job performance was not satisfactory.  (ECF No. 72-2, at 39-40).  In Mr. Johnson's affidavit, he stated that he observed that Plaintiff heavily relied on his subordinates and his supervisors, was unable to handle tasks assigned to him, did not resolve urgent issues for several days, was unresponsive in emergencies, was often unreachable because he

did not carry his required walkie-talkie,[4] did not provide a requested update on tasks for which he had already missed the deadline, never completed those tasks,[5] failed to communicate regarding his team's confusion about PPE, and never came to his committee meetings. (ECF No. 72-5, at 3-6). In Mr. Cawley's affidavit, he stated that Plaintiff was unable to answer basic questions or provide basic information about Defendants' security needs, was often unreachable, stated that he went shopping for Segways during work hours when the store had closed the year prior and Mr. Pallozzi had already informed him that Defendants would not approve the purchase of Segways, was often absent during work hours, never provided an update or completed his outstanding tasks, did not use his required time off during the COVID-19 pandemic, did not comply with Defendants' procedures for requesting leave, and failed to comply with his obligation to address or report his subordinate's report of potential discrimination. (ECF No. 72-6, at 4-9). Mr. Clark stated in his affidavit that Plaintiff delegated many of his responsibilities to him. (ECF No. 72-7, at 3-4).

---

[4] Plaintiff admitted that he often did not carry his walkie-talkie, although he argued that it was not mandatory to do so. (ECF No. 72-8, at 5-7).

[5] Plaintiff admitted that he did not provide the update or complete the tasks. (ECF No. 72-8, at 16-22).

Mr. Cawley was so concerned about Plaintiff's attendance issues that he requested that HR investigate whether Plaintiff was committing theft of company time and resources. (ECF No. 72-6, at 6). The investigation revealed that Plaintiff was chronically absent. (ECF Nos. 72-6, at 7; 73-3; 73-6; 73-7). Mr. Cawley was also so concerned about Plaintiff's performance issues that he instructed Mr. Johnson to prepare a list of security-related tasks that Plaintiff had failed to complete, presented the list to Plaintiff on September 30, 2020, and asked for an update by October 2, 2020. (ECF Nos. 72-5, at 5-6; 72-6, at 6). Plaintiff never provided an update and never completed the tasks. (ECF Nos. 72-5, at 6; 72-6, at 7; 72-8, at 16-22). Mr. Cawley escalated the issues to HR and Mr. Pallozzi on October 5, 2020, noting that during the pandemic Plaintiff's team had a high volume of complaints and concerns, that Plaintiff was not proactively addressing the confusion and discontent in his Department, and that many of his deliverables were left incomplete or done in such a way that showed little to no effort. (ECF Nos. 72-6, at 7; 73-6). He states in his affidavit that he was considering terminating Plaintiff's employment at this point. (ECF No. 72-6, at 7). Mr. Cawley also set up a call on October 22, 2020 with Mr. Pallozzi and others to address Plaintiff's performance, attendance, leadership style, and adherence to Defendants' values. (ECF No. 73-15).

Plaintiff cites to his performance evaluation covering the period from July 1, 2019 through June 30, 2020, as evidence that he was meeting his employer's legitimate expectations. (ECF No. 68-1, at 24-35). His evaluation provides:

> I think overall Larry has had a solid year from a leadership perspective. He is working to bring about change in the culture of the department and elevate the role that our security officers play. He has identified new roles for some of his officers and they appear to be excelling in those roles.
> One thing I would suggest is that Larry works on "Managing Up" less and delegating fewer activities to his supervisors and support staff. As the Director of the department you need to make the difficult decisions and not push them up the chain of command or farm out all the work.

(ECF No. 68-1, at 29). In the supplement to his opposition, he also cites to praise he and his team received for their performance between May 21, 2019 and October 6, 2020. (ECF No. 82-27, at 3-5, 7-21). The performance evaluation, although dated in September, covered the time period ending on June 30, 2020. That time period preceded much of the concern expressed by upper management and Plaintiff's ultimate termination in October, and does not indicate that he was performing to his employer's legitimate expectations at the time of his termination.

Many of the emails expressing praise also predate upper management's period of concern. The only emails Plaintiff identifies that occurred near the relevant time period are: (1)

an August 14, 2020 email from Mr. Cawley stating, "Nicely done. Glad this is starting to come together[]" in response to Plaintiff's email providing instructions to his Department; (2) an August 19, 2020 email from an Emergency Department staff member "giv[ing] another huge Kudos to our security team today in the Emergency Department" for their assistance with seven "violent, aggressive, agitated, confused, and not redirectable[]" patients; (3) an August 19, 2020 email stating, "I do think security needs some extra recognition for yesterday[;]" (4) an August 20, 2020 email from Mr. Cawley stating that "teamwork saved the day. I've passed this onto our MGSH/MUMH leadership team and this is a terrific safety moment to use at our next senior managers meeting. Please thank your team for their heroic work today[;]" and (5) an October 6, 2020 email from a nurse stating, "I just wanted to give a shout out for your wonderful team . . . Thank you Ken for your support and guidance with a scary man. As always, it is greatly appreciated by myself and my team." (ECF No. 82-27, at 5, 7, 13, 16, 18). With the exception of August 14, 2020 email, these emails praise the performance of members of Plaintiff's Department, not necessarily Plaintiff himself. Indeed, the attendance investigation reveals that Plaintiff did not report to work on August 19, 2020, one of the dates about which Plaintiff's Department received praise. (ECF No. 73-3, at 4). The "mere existence of a 'scintilla' of evidence" is insufficient to raise

an inference that Plaintiff was meeting his employer's legitimate expectations at the time that his employment was terminated. *Liberty Lobby*, 477 U.S. at 252.

Nor has Plaintiff raised an inference that he received different treatment from similarly situated employees outside his protected class. The "general rule" within the Fourth Circuit is that a plaintiff must show that the position was filled by a similarly qualified applicant outside the protected class to satisfy the fourth element of a prima facie case. *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005). There are, however, exceptions to this rule, including cases where: "(1) an age discrimination plaintiff is replaced by a much younger person within the same class, (2) a significant lapse of time occurs between the adverse employment action and the decision to hire another person, and (3) the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination[.]" *Id.* (citing *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998)).

It is undisputed that Defendants replaced Plaintiff with Ms. Darby, who is Black. (ECF Nos. 72-6, at 8; 81, at 23). Although Defendants argue that they named Ms. Darby as Plaintiff's replacement "just a few months" after Plaintiff's termination, Defendants have not provided evidence of when she was appointed.

(ECF Nos. 72-2, at 41; 72-6, at 8).   In his supplement to his
opposition, Plaintiff asserts that

> the new Chief of Security was not selected
> until one year later (2021) well into my
> lawsuit.  Medstar selection was only façade to
> attempt to cover up wrongdoing.   Plaintiff
> placed the selected individual in place as a
> temporary solution while Plaintiff was out on
> leave, individual is totally not qualified.
> The individual was only selected to help cover
> up wrongdoing by Medstar Health Hospitals and
> the Defendants.

(ECF No. 81, at 23).  Plaintiff identifies no evidence to support
these   assertions.     Arguing   that   an   exception   applies   is
insufficient—Plaintiff   must   establish   its   applicability.   *See*
*Miles*, 429 F.3d at 489 (ruling that the plaintiff must "show" that
the exception applies and holding that an exception applied where
the   plaintiff   proffered   "evidence"   in   support   of   its
applicability); *Johnson v. Merchants Terminal Corp.*, No. 16-cv-
838-ELH, 2017 WL 1546429, at *11 (D.Md. Apr. 27, 2017) (granting
summary judgment to defendant on Title VII race discrimination
claim because "plaintiff has presented no evidence that any of
these exceptions are applicable[]"); *Mabry v. Cap. One, N.A.*,
No. 13-cv-02059-GJH, 2014 WL 6875791, at *5 n.3 (D.Md. Dec. 3,
2014) (concluding no exceptions apply because "[t]here is simply
no evidence that Capital One's decision to hire an African-American
replacement was done to disguise discrimination . . . Nor is there
evidence to suggest that any of the other situations identified in

*Miles* are present here[]"); *Salter v. Alltel Commc'ns, Inc.*, 407 F.Supp.2d 730, 736 (E.D.N.C. 2005) (holding that plaintiff "failed to establish the applicability of any [] exception"). Plaintiff has not provided any evidence that Defendants replaced him with Mr. Darby to disguise their act of discrimination or that the position went unfilled for a year. Consequently, he has not established a prima facie case of discriminatory termination.

Even if Plaintiff had established a prima facie case, however, Defendants have produced evidence of a legitimate, non-discriminatory reason for the termination. *Hoyle*, 650 F.3d at 336-37. As explained, Defendants have proffered substantial evidence showing that they terminated Plaintiff's employment due to serious concerns about his attendance and performance. Plaintiff has not attempted to show that Defendants' stated reason for his termination was pretextual. Accordingly, Plaintiff's motion for summary judgment on Count VII will be denied. Because Plaintiff cannot demonstrate that Defendants discriminated against him on the basis of race in violation of Title VII or the MFEPA, Defendants' cross-motion for summary judgment will also be granted as to Counts II and VII.

### b. Race-Based Hostile Work Environment Claims

In Counts IX and X, Plaintiff alleges that Defendants subjected him to a hostile work environment on the basis of race in violation of Title VII and the MFEPA respectively. (ECF No. 1

¶¶ 149-156).   Plaintiff alleges four examples of hostile work environment:  (1) the nursing staff, who were predominantly white, were provided with N-95 masks during the COVID-19 pandemic, while the security staff, who were predominantly people of color and in particular Black, were not; (2)  Mr.  Cawley was "critical, questioning, and rude[]" to Plaintiff; (3) "Mr. MacDonald made a comment in [Plaintiff's performance] evaluation regarding the use of the term 'farming out,' a term Mr. Covington perceived as having racial  connotations  regarding  African  Americans  as  it  was  his understanding it hearkened back to a time in the United States where black children would be sent to the homes of white families to work[,]" and, when Plaintiff asked Mr. MacDonald and Mr. Cawley to  remove  the  term  from  his  evaluation,  they  refused;  (4)  a security  staff  member  informed  Plaintiff  that  "a  group  of  white nurses  were  laughing  at  a  caricature  of  'black  face'  shaped  as excrement on the computer screen at one of the nurse's stations[,]" and, when Plaintiff reported the depiction, Ms. Handwerk assigned it to a HR employee who did not follow up.  (ECF No. 1 ¶¶ 26-31, 49,  52-62,  64-66,  68-70,  77-78).   Plaintiff  does  not  move  for summary judgment on either of his hostile work environment claims.

In their cross-motion for summary judgment, Defendants assert that  Plaintiff  has  failed  to  produce  evidence  necessary  to establish a prima facie case of a hostile work environment.  (ECF No.  72-2,  at  41-43).   Specifically,  they  contend  that:   (1)  the

Mr. Hankey the Christmas Poo meme is not racially discriminatory; (2) Plaintiff presents no evidence that Defendants' systemwide decision regarding the distribution of N-95 masks during the COVID-19 pandemic was a racially discriminatory event; (3) Plaintiff's dislike of his supervisor's treatment does not amount to a claim of hostile work environment; and (4) Plaintiff's claim that use of the term "farming out"—a race-neutral term—in his performance evaluation is discriminatory is meritless.  (ECF No. 72-2, at 43-50).

The Fourth Circuit has summarized the standard for establishing a race-based hostile work environment claim:

> When racial animus in the workplace creates a hostile work environment, requiring an affected employee to work in it amounts to intentional racial discrimination by the employer and is actionable under Title VII. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (en banc) (citing 42 U.S.C. § 2000e-2(a)(1)).  To succeed on a hostile-work-environment claim "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff' . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id.* at 277 (alteration in original) (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)).  A hostile-work-environment claim will only succeed when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v.*

> *Forklift Sys., Inc.*, 510 U.S. 17, 21, 114
> S.Ct. 367, 126 L.Ed.2d 295 (1993)). Unlike a
> typical claim of intentional discrimination
> based on a discrete act, a hostile-work-
> environment claim's "very nature involves
> repeated conduct." *Nat'l R.R. Passenger Corp.
> v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061,
> 153 L.Ed.2d 106 (2002).
>
> The severe or pervasive conduct which
> gives rise to an abusive work environment must
> be both objectively and subjectively "hostile"
> and "abusive." *Harris*, 510 U.S. at 21-22, 114
> S.Ct. 367 (requiring the plaintiff to prove
> "the environment would reasonably be
> perceived, and is perceived, as hostile or
> abusive"). Objective analysis of whether a
> workplace is hostile and abusive looks to "all
> the circumstances," including "the frequency
> of the discriminatory conduct; its severity;
> whether it is physically threatening or
> humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an
> employee's work performance." *Boyer-Liberto*,
> 786 F.3d at 277. But the ultimate inquiry is
> whether the conduct is so "extreme" that it
> "amount[s] to a change in the terms and
> conditions of employment." *Faragher v. City
> of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct.
> 2275, 141 L.Ed.2d 662 (1998). Even conduct
> that would objectively cause hurt feelings or
> offense is not enough to be severe or
> pervasive. *EEOC v. Sunbelt Rentals, Inc.*, 521
> F.3d 306, 315 (4th Cir. 2008).

*McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022).

### i.   N-95 Masks

Plaintiff alleges that during the COVID-19 pandemic, Defendants provided N-95 masks to the nursing staff, who were predominantly white, but not the security staff, who were predominately Black. (ECF No. 1 ¶¶ 27-31). He also alleges that

his subordinates requested N-95 masks and that he passed on the request to Defendants, who denied the request.   (*Id.* ¶¶ 32-36). As a result, he alleges, "a disproportionate number of African American/black employees [became] ill, some of whom became very sick." (*Id.* ¶ 37).  Finally, Plaintiff alleges that he complained to Mr. Pallozzi that "African American/black security officers were being required to enter positive COVID-19 patient rooms wearing only surgical masks while the nursing staff, which was predominantly white, was afforded both N-95 masks and face shields for PPE[,]" but "no meaningful investigation or prompt remedial action was taken by Defendants in response to his complaints." (*Id.* ¶¶ 43, 44).

Plaintiff has not provided any evidence showing that Defendants' decision to distribute N-95 masks to nurses but not to security staff was based on Plaintiff's race.  To the contrary, Defendants have provided evidence that they experienced a shortage of N-95 masks during the pandemic and updated their policies to reserve N-95 masks only for their healthcare providers who were in direct contact with plausible COVID 19-patients, a group that does not include the Security Department.  (ECF Nos. 72-6, at 3; 73-30, at 2-3; *see also* ECF No. 68-1, at 10-11).  This directive applied to every MedStar facility, not just MUMH and not just MUMH's Security Department.  (ECF No. 72-6, at 3).

Nor has Plaintiff shown that Defendants' failure to provide N-95 masks to security staff was "sufficiently severe or pervasive to alter [his] conditions of employment and to create an abusive work environment[.]" *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 229 (4th Cir. 2022) (quoting *Boyer-Liberto*, 786 F.3d at 277). "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Perkins*, 936 F.3d at 208 (quoting *Sunbelt Rentals*, 521 F.3d at 315). Although Defendants' failure to provide N-95 masks may have physically exposed non-healthcare provider staff to a risk of contracting COVID-19, Defendants' provision of other PPE including surgical masks, gloves, face shields, and hand sanitizer mitigated this risk. (ECF Nos. 68-1, at 10-11; 72-6, at 3; 72-8, at 9). Plaintiff has not demonstrated that Defendants' failure to provide N-95 masks was frequent (given that they provided N-95 masks to Plaintiff and his Department in April 2020), severe (given the shortage and CDC

guidance), humiliating, or that it unreasonably interfered with his work performance.

Nor has Plaintiff shown that "but for his race, he would not have been the victim of the alleged discrimination." *Gilliam v. S.C. Dep't of Juv. Just.*, 474 F.3d 134, 142 (4th Cir. 2007) (quoting *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)) (internal brackets and quotation marks omitted).   Indeed, when MedStar maintained its policy of reserving N-95 masks for healthcare providers with direct patient care responsibilities, Black nurses would have received an N-95 mask, while white security staff would not.   A reasonable jury could not conclude that Defendants' decision to provide N-95 masks to nursing staff but not security staff constituted race-based harassment.

### ii.  Mr. Cawley's Treatment

Plaintiff alleges that he experienced "critical, questioning, and rude" treatment from Mr. Cawley.   (ECF No. 1 ¶ 52). Specifically, he alleges that Mr. Cawley:  (1) "pointedly asked Mr. Covington if Mr. Covington had a 'problem' with "the leadership[]" after Plaintiff expressed concerns about the N-95 masks; (2) "questioned several of the security staff in a very sharp tone, asking where Mr. Covington was and when they responded with what they knew, he did not believe them.  He went so far as to accuse them of lying," which led Plaintiff's staff to "wonder[] if [Mr. Cawley's conduct] was racially motivated[]" and led

Plaintiff to have "concerns . . . that Mr. Cawley's denigrating treatment might be race based[;]" (3) "surreptitiously sought to monitor Mr. Covington's meeting[]" with his security staff and sent an email afterwards "admonishing him for his statements during the leadership team call[;]" and (4) "accused Mr. Covington of not following proper protocol when he sent out the group email [stating that he would be taking leave,]" "questioned Mr. Covington's placement of Ms. Darby as Supervisor-in-Charge during his absence[,]" "stated it was the first he had heard of Mr. Covington being out on sick leave[,]" and stated, "if you are truly on medical leave you should not be checking emails[,]" which Plaintiff interpreted as "a challenge, questioning whether Mr. Covington was, indeed, as ill as he stated."   (ECF No. 1 ¶¶ 49, 52-58, 68-70, 77-78).

"[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Perkins*, 936 F.3d at 208 (quoting *Sunbelt Rentals*, 521 F.3d at 315-16).   Plaintiff provides no evidence that Mr. Cawley's criticism was based on Plaintiff's race.   For example, he does not argue, and has not established, that Mr. Cawley treated non-Black employees differently than he did Plaintiff.   Additionally, although Mr. Cawley's criticism of Plaintiff may have been frequent, Plaintiff provides no evidence that it was severe,

physically threatening or humiliating, or unreasonably interfered with his work performance.  A reasonable jury could not find that Mr. Cawley's treatment of Plaintiff constituted race-based harassment.

### iii.  "Farming Out"

Plaintiff alleges that Defendants used the term "farming out" on his performance evaluation.  (ECF No. 1 ¶ 60).  He alleges that he "perceived [the term] as having racial connotations regarding African Americans as it was his understanding it hearkened back to a time in the United States where black children would be sent to the homes of white families to work."  (*Id.*).  Finally, he alleges that he asked Mr. MacDonald and Mr. Cawley to remove the term from his evaluation but they refused.  (*Id.* ¶¶ 61-62).  Plaintiff attaches to his motion for summary judgment three pages of two articles entitled "When Black Children Were Farmed Out to White Families" and "'Farmed' out to a white family, I became a skinhead: Adewale Akinnuoye-Agbaje on his first film" in support of these allegations.  (ECF No. 68-1, at 41-43).

Plaintiff has not demonstrated that Defendants' use of the term "farming out" in his performance evaluation was based on his race.  The Merriam-Webster Dictionary defines "farm out" as

> 1: to turn over for performance by another usually under contract
>
> *farm out* a job

>2a: to put (someone, such as a child) into the hands of another for care
>
>b: to send (an athlete, such as a baseball player) to a farm team
>
>3: to exhaust (land) by farming especially by continuously raising one crop

"*Farm Out*," Merriam-Webster (Aug. 5, 2024), https://perma.cc/D47R-QW4U.   Mr. MacDonald's comment in Plaintiff's performance evaluation reads:  "One thing I would suggest is that Larry works on 'Managing Up' less and delegating fewer activities to his supervisors and support staff.  As the Director of the department you need to make the difficult decisions and not push them up the chain of command or farm out all the work."  (ECF No. 68-1, at 29).  The use of the term in Plaintiff's performance evaluation is consistent with the first dictionary definition.

The articles Plaintiff cites discuss a film entitled "Farming," the title of which "refers to a social practice in which Nigerian immigrants to Britain would temporarily give their children to white foster families, sending money for a child's keep while they studied to make a better life for themselves." Josh Slater-Williams, *When Black Children Were Farmed Out to White Families*, Another Man (Oct. 1, 2019), https://perma.cc/D4CC-9ZHJ; *see also* Tim Adams, *'Farmed' out to a white family, I became a skinhead: Adewale Akinnuoye-Agbaje on his first film*, The Guardian (Sept. 8, 2019), https://perma.cc/WYV6-XU93 ("It both dramatises

75

a brutal and moving coming-of-age and shines a light on a little-known chapter in the story of race relations in Britain:  the practice that led to thousands of Nigerian children like Akinnuoye-Agbaje being 'farmed out' to British families in that period."). Neither article discusses a practice of sending Black children in the United States to the homes of white families to work, as Plaintiff alleges.  Plaintiff does not present any evidence showing that the term can refer to such a practice.  Nor has he demonstrated that a reasonable person would have found the use of the term hostile or abusive.  *Harris*, 510 U.S. at 21-22.  A reasonable jury could not conclude that Defendants' use of the term "farming out" in Plaintiff's performance review constituted race-based harassment.

### iv.  Mr. Hankey the Christmas Poo Meme

Plaintiff alleges that one of the members on his security team complained to him that "a group of white nurses were laughing at a caricature of 'black face' shaped as excrement on the computer screen at one of the nurse's stations."  (ECF No. 1 ¶ 64).  He alleges that he "forwarded this depiction to Mr. MacDonald, Mr. Johnson[,] and the former Director of Human Resources, Ashley Handwerk[,]" and that Mr. MacDonald did not respond, Ms. Handwerk "assigned the issue to a human resources business partner who did not follow up[,]" and Mr. Johnson "acknowledged that it was inappropriate but took no further action because he believed it

was not racially derogatory, noting it was the cartoon character known as 'Mr. Hankey the Christmas Poo' appearing on 'SouthPark,' a show on Comedy Central." (*Id.* ¶¶ 65-66).

Plaintiff has not established that the nurses looked and laughed at the meme based on his, or anyone else's race. Indeed, he has not shown that the meme was racist. (ECF No. 68-1, at 37). Even if the meme was discriminatory, it was shared only one time and amounted to an online version of "'a mere offensive utterance' rather than a more egregious slur that is 'physically threatening or humiliating.'" *Boyer-Liberto*, 786 F.3d at 286 (quoting *Faragher*, 524 U.S. at 787-88). Plaintiff has not established that the nurses' behavior was frequent, severe, physically threatening or humiliating, or unreasonably interfered with his work performance. A reasonable jury could not conclude that the nurses' behavior constituted race-based harassment.

Because Plaintiff cannot demonstrate that Defendants subjected him to a hostile workplace environment, Defendants' motion for summary judgment on Counts IX and X will be granted.

### 4. Retaliation Claims (Counts I, III, IV, and V)

Plaintiff alleges that Defendants retaliated against him for having disabilities and requesting FMLA leave in violation of the FMLA and ADA (Counts I and III respectively) and complaining about disparate treatment of Black employees in violation of Title VII and the MFEPA (Counts IV and V respectively) by terminating his

employment.  (ECF No. 1 ¶¶ 109-117, 121-138).  Plaintiff moves for summary judgment on Count I (relevant here is the portion alleging FMLA retaliation).  He asserts that his separation agreement, Matrix letter instructing him to have his healthcare provider submit a certification form, and Matrix email granting his extension request support his motion on Count I.  (ECF No. 68, at 32).  In their cross-motion for summary judgment, Defendants assert that Plaintiff has failed to produce evidence proving that the adverse action taken against him was because of any protected activity in which he engaged.  (ECF No. 72-2, at 51-54).

The FMLA, ADA, Title VII, and MFEPA prohibit employers from discriminating against an employee for opposing any practice made unlawful by the statute or for filing a charge, testifying, assisting, or participating in any proceeding under the statute. 29 U.S.C.A. § 2615; 42 U.S.C.A. § 12203(a); 42 U.S.C.A. § 2000e-3(a); Md. Code Ann., State Gov't § 20-606(a), *amended by* Discrimination—Military Status—Prohibition, 2024 Maryland Laws Ch. 322 (H.B. 598).  Absent direct or indirect evidence, a plaintiff alleging retaliation under the FMLA, ADA, Title VII, or MFEPA must make a prima facie showing that:  (1) he or she engaged in protected activity, (2) the employer took an adverse action against him or her, and (3) a causal relationship existed between the protected activity and the adverse action.  *Vannoy*, 827 F.3d at 304 (FMLA); *Jacobs*, 780 F.3d at 577-78 (ADA); *Barreto v. SGT, Inc.*, 826 F.App'x

267, 271 (4th Cir. 2020) (Title VII and MFEPA).  To establish a causal relationship between the protected activity and adverse action, "a plaintiff can either show a temporal proximity between the protected activity and adverse action, or that other relevant evidence indicates 'continuing retaliatory conduct and animus' toward the plaintiff." *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 156 (4th Cir. 2023) (quoting *Lettieri*, 478 F.3d at 650).

Once the plaintiff proffers evidence establishing his or her prima facie case, the burden shifts to the employer to offer a non-retaliatory reason for the adverse action.  *Vannoy*, 827 F.3d at 304 (FMLA); *Jacobs*, 780 F.3d at 577-78 (ADA); *Barreto*, 826 F.App'x at 271 (Title VII and MFEPA).  Then, the plaintiff bears the ultimate burden of establishing that the employer's proffered explanation is pretext for retaliation.  *Id.*

Plaintiff does not request to proceed by direct or indirect evidence of retaliation.  *Compare Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (applying the *McDonnell Douglas* framework where plaintiff "does not claim to proceed by direct evidence[]") *with Jacobs*, 780 F.3d at 577-78 (evaluating evidence where plaintiff argues that it has provided direct and indirect evidence of retaliation).  Nor has he provided any such direct or indirect evidence.  The only potentially relevant exhibit in his motion for summary judgment is the December 21, 2019 email in which

Plaintiff forwarded a message about a nurse using a racial slur to Mr. MacDonald and Ms. Handwerk.  (ECF No. 68-1, at 44).  The motion does not include any other instances in which he complains about Defendants' alleged disparate treatment of Black employees.

The potentially relevant exhibits in Plaintiff's supplement to his opposition include:  (1) a July 21, 2019 email from a member of Plaintiff's Department reporting that a nurse used a racial slur; (2) a July 26, 2020 email from Plaintiff to Mr. Pallozzi in which Plaintiff complains that Mr. Cawley made two of his security Department staff feel "uncomfortable and concerned" because he asked them about Plaintiff's whereabouts and said "[d]on't lie to me," causing Ms. Oakley Anderson to feel "harassed, disrespected and bullied" and to "wonder[] if she was not a Black female in her role would he talk to her in this manner"; (3) a July 24, 2020 email from Ms. Oakley Anderson to Plaintiff discussing the interaction with Mr. Cawley stating that "[n]ever have I ever been insulted, and my integrity questioned, until now"; (4) a January 6, 2020 email from Ms. McKoy asking the Security Department member to follow up with her regarding his complaint about an ER nurse who made a racist comment; (5) an October 7, 2020 email from Plaintiff to Mr. Pallozzi in which Plaintiff complains that while he was on leave, Mr. Johnson began holding security meetings and giving orders to Plaintiff's staff, which Plaintiff described as a "witch hunt" and a "negative paper trail" although he does not

state that Mr. Johnson's behavior was related to Plaintiff's race;
(6) an October 15, 2020 email in which Plaintiff complains to Mr.
Pallozzi that Mr. Johnson "c[a]me into [his] department and over
step[ped] his boundaries," although he again does not mention race;
(7) a November 2, 2020 email from Plaintiff to Ms. Layman stating
that "[m]y doctor has been treating/helping me get through another
anxiety attack once again caused by Brian Cawley racial & hostile
work environment actions towards me[,]" "Mr. Brian Cawley is
racist, I knew for sometime part of the reason I was being pushed
out/terminate[d] from my job[] [w]as so Brian Cawley could insert
his good friend Edwards Johnson into my role[,]" "I always had
great fear of contacting you or your Department because of your
close relationship and the number [one] fact is, [h]e's white and
I am black[,]" "[m]y fear is you sharing this information with
Brian Cawley and he retaliate on my former staff[,]" Mr. Cawley
made "comments and questions" to his staff "because it is a[n] all
black department[;]" (8) a text message in which Plaintiff tells
Mr. Johnson that a member of the Security Department complained
about the Mr. Hankey meme and Mr. Johnson responds that "[a]lthough
inappropriate it is not a derogatory thing[;]" and (9) Plaintiff's
undated document entitled "SUMMARY OF ISSUE AND CONCERNS" stating
that "I immediately saw the disparity in treatment between the
security staff and other departments and leadership.  As a
predominately black department (Security Department) I wondered

about the source of this difference in treatment." (ECF Nos. 82-1, at 2; 82-2, at 2; 82-3, at 3-4; 82-11, at 2; 82-13, at 2-4; 82-17, at 2; 82-24, at 3).

Although some of these exhibits contain Plaintiff's reports of what he believed were racist incidents, none provide direct or indirect evidence that Defendants terminated his employment because of Plaintiff's reports. Nor do any of the exhibits provide direct or indirect evidence that Defendants terminated Plaintiff's employment because he had disabilities or took leave. Thus, Plaintiff must proceed, if at all, via the *McDonnell Douglas* framework. It is undisputed that Plaintiff engaged in protected activity by attempting to take FMLA leave and complaining about racism[6] and that Defendants took the adverse action of terminating his employment. (ECF No. 72-2, at 51). The parties dispute the causal relationship prong. (*Id.*). Plaintiff does not specify whether he can satisfy the causal relationship prong by "show[ing] a temporal proximity between the protected activity and adverse action," or by showing that "that other relevant evidence indicates

---

[6] Defendants nominally state that that Plaintiff has not satisfied the protected activity prong, but do not substantively mount a defense: "While Defendants do not believe that Plaintiff adequately proved that he engaged in protected activity related to his race, even assuming that he had, he has presented no evidence connecting those activities to his termination." (ECF No. 72-2, at 53).

'continuing retaliatory conduct and animus' toward" him.  *Alberti*, 65 F.4th at 156 (quoting *Lettieri*, 478 F.3d at 650).

### a. FMLA and ADA Claims (Counts I and III)

Defendants argue that Plaintiff's FMLA and ADA retaliation claims must fail because the evidence shows that decisions leading to his termination were made before he notified his supervisor that he had a health condition or that he needed leave.  (ECF No. 72-2, at 51-53).

Plaintiff engaged in protected activity when he requested FMLA leave on October 5, 2020.  (ECF Nos. 68-1, at 19; 82, at 2; 82-16, at 2-3).  Defendants, however, had raised concerns with Plaintiff's performance and attendance before he requested leave.  (ECF Nos. 72-6; 73-2; 73-3; 73-5; 73-6; 73-7).  Indeed, Mr. Cawley began investigating Plaintiff's attendance in summer 2020 and emailed leadership an hour before Plaintiff notified him that he would be taking leave "for the purpose of determin[ing] how to best address Mr. Covington's performance issues, including through termination."  (ECF No. 72-6, at 6).  The issues themselves that led to the investigation and these communications had, of course, begun earlier.  The Fourth Circuit has ruled that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299,

309 (4th Cir. 2006) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002)).  In *Francis*, the Fourth Circuit held that when "[t]he actions that led to [the plaintiff's] probation and termination began before her protected activity, . . . no reasonable factfinder could conclude, based solely on the evidence in the record, that [the employer's] actions against [the plaintiff] were taken in retaliation for the exercise of her rights[.]"  *Id.; see also Manguiat v. Bd. of Educ. of Prince George's Cnty.*, No. 13-cv-1165-GJH, 2015 WL 2376008, at *9 (D.Md. May 18, 2015) ("[B]ecause the alleged retaliation took place before [plaintiff] engaged in protected activity there can be no causal connection between the two."); *Pearson v. Owen Elec. Steel Co. of S.C.*, No. 3:17-cv-1943-MBS-PJG, 2017 WL 9286996, at *2 (D.S.C. Oct. 6, 2017), *report and recommendation adopted*, No. 3:17-cv-1943-MGL, 2018 WL 388000 (D.S.C. Jan. 12, 2018) ("[A]lleged retaliatory acts which occur before the protected activity cannot support a retaliation claim.")

Here, Plaintiff has not established that any evidence besides timing suggests that Defendants retaliated against him by terminating his employment after he had requested FMLA leave and before he received a decision on whether he was eligible for leave. The actions that led to Plaintiff's termination—his attendance and performance issues—occurred before he requested FMLA leave.  No

reasonable jury could find that a causal connection existed between Plaintiff's request for FMLA leave and Defendants' termination of his employment.  Plaintiff has not satisfied the causal connection prong in establishing a prima facie case.[7]  Because Plaintiff cannot prove that Defendants retaliated against him in violation of the FMLA or ADA, Defendants' motion for summary judgment will be granted as to the portions of Counts I and III alleging retaliation in violation of the FMLA and ADA respectively.

### b. Title VII and MFEPA Claims (Counts IV and V)

Defendants assert that, assuming Plaintiff engaged in protected activity by complaining about the Mr. Hankey the Christmas Poo meme or N-95 masks, his Title VII and MFEPA retaliation claims fail because he has presented no evidence that his termination was in any way connected to such activity.  (ECF No. 72-2, at 53-54).

Plaintiff engaged in protected activity when he reported instances of perceived racism on December 21, 2019 (reporting to Mr. MacDonald and Ms. Handwerk a Security Department member's complaint about a nurse using a slur) and July 26, 2020 (reporting Ms. Oakley Anderson's complaint to Mr. Pallozzi and stating that

---

[7] Even if Plaintiff had established a prima facie case of retaliation, Defendants have offered a non-retaliatory reason for Plaintiff's termination.  As discussed above, Defendants have demonstrated that they terminated Plaintiff's employment due to concerns with his performance and attendance.  Plaintiff has not shown that Defendants' stated reason is pretextual.

he wonders if Mr. Cawley would have treated her differently if she were not a Black woman).  (ECF Nos. 68-1, at 44; 82-3, at 2-3). Although Plaintiff alleges that he reported the incident involving nurses laughing at the Mr. Hankey the Christmas Poo meme in December 2019 to Mr. MacDonald, Mr. Johnson, and Ms. Handwerk, he provides no evidence of this report.  Mr. Cawley asserts in his affidavit that the first he learned of Plaintiff's concerns about the meme was when Plaintiff filed a charge of discrimination.  (ECF No. 72-6, at 8-9).  Plaintiff does provide evidence that he texted Mr. Johnson about the incident, but he alleges that "Mr. Johnson was never Mr. Covington's supervisor[.]"  (ECF Nos. 1 ¶ 17; 82-13, at 3-4).  Additionally, although Plaintiff complained to Defendants that he and his Department did not receive N-95 masks, (ECF Nos. 68-1, at 68-1, at 10-12; 73-29, at 2-4; 82-6, at 2-4, 7-8), he has not offered any evidence that he communicated any concerns that Defendants did not provide N-95 masks to the security Department because of race.  Mr. Cawley attests to the same in his affidavit.  (ECF No. 72-6, at 4).  Finally, although Plaintiff expressed displeasure with Mr. MacDonald's comment in his performance review to Mr. Cawley, (ECF No. 68-1, at 2), he has not provided any evidence that he communicated that he believed the term was racist.

Mr. Cawley was the decisionmaker in terminating Plaintiff's employment.  (ECF No. 72-6, at 8).  "To establish a causal

relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 655 (4th Cir. 1998) ("A plaintiff cannot establish a prima facie case of retaliation when, as here, the relevant decisionmaker was unaware that the plaintiff had engaged in a protected activity."). Mr. Cawley began his tenure as Plaintiff's supervisor in summer 2020, meaning the only protected activity that Plaintiff engaged in while Mr. Cawley supervised him was the July 26, 2020 report to Mr. Pallozzi regarding Mr. Cawley's treatment of Ms. Oakley Anderson. (ECF No. 82-3, at 2-3). Plaintiff has provided no evidence that Mr. Cawley had "actual knowledge" of the July 26, 2020 report or any other report. *Roberts*, 998 F.3d at 125. Mr. Cawley "disclaims any knowledge of the harassment, and no evidence in the record contradicts his denial." *Id.* Plaintiff does not argue, and no evidence suggests, that Mr. Pallozzi, Mr. MacDonald, or anyone else told Mr. Cawley of Plaintiff's reports. Even if Plaintiff did argue that someone with knowledge of his protected activity communicated their knowledge to Mr. Cawley, his "burden here [would] require[] 'more evidence than mere curious timing coupled with speculative theories' about 'discussions between a decisionmaker and someone

with knowledge of the plaintiff's protected activity' that 'create[] only a speculative inference regarding the decisionmaker's awareness.'" *Id.* at 126 (quoting *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017)).

Because Plaintiff has not satisfied the causal relationship prong, he has not established a prima facie case of retaliation. Thus, he cannot succeed on Counts IV and V. Accordingly, Defendants' motion for summary judgment will be granted as to these counts.

## IV. Defendants' Motion to Seal

Defendants move to file under seal several of the exhibits to their motion to dismiss or, in the alternative, cross-motion for summary judgment. (ECF No. 71). They seek to seal the following exhibits:

> (1) Chief of Security Job Description
> (6) September 30, 2020 Email from Brian Cawley to Plaintiff
> (7) Plaintiff's Work Performance Deficiencies
> (8) October 2, 2020 Email from Mr. Cawley to Mr. MacDonald and Ms. Layman re: Plaintiff Attendance
> (9) March 28, 2020 Email from Mr. MacDonald to Leadership re: Required PTO
> (10) October 5, 2020 Email from Ms. Layman to Mr. Cawley re: No PTO Taken
> (11) October 5, 2020 Email from Mr. Cawley to Mr. Pallozzi
> (12) October 2, 2020 Email from Mr. Cawley to Mr. MacDonald and Ms. Layman re: Plaintiff Attendance
> (13) October 5, 2020 Email from Plaintiff to Mr. Cawley and Others re: Leave

(14) Plaintiff's Text Messages with Mr. Pallozzi

(15) Email between Mr. Cawley and Plaintiff re: Medical Leave or PTO

(16) October 8, 2020 Matrix Letter and Attachments

(17) October 9, 2020 Matrix Letter and Attachments

(18) October 21, 2020 Matrix Correspondence

(19) November 9, 2020 Email between Plaintiff and Matrix

(20) October 22, 2020 Email from Mr. Cawley to Ms. Layman

(21) Termination Letter

(22) Plaintiff's ATIs

(23) Model Cities Invoices

(24) Model Cities Payments to Security and Asset Solutions

(25) Transcript of Deposition of Corporate Designee of Security & Asset Solutions

(26) Vie Management – Time, Pay, and ATP Records

(29) Planned Parenthood Application Package

(31) Charge of Discrimination

(32) Plaintiff's Medical Records in October 2020

(33) Affidavit of Ms. Darby

(34) December 29, 2020 Email from Matrix re: Lack of Medical Documentation

(35) Plaintiff E-Mail re: Medical Personal Leave

(36) Text Messages Between Mr. Johnson and Plaintiff

(37) April 29, 2020 Email from Mr. MacDonald re: PPE

(38) March 31, 2020 Email from Plaintiff re: PPE

(39) Article re: When Black Children Were Farmed Out Documentary

(40) Vie Management Application

(41) Plaintiff's Responses to Requests for Documents

(42) Dr. Roshanda Shoulders Affidavit

(ECF No. 71, at 1). Defendants assert that: (1) [s]everal of these Sealed Exhibits are obtained from Defendants' private and

confidential intranet and/or contain internal communications related to its business operations that are considered proprietary information[;]" (2) "Plaintiff has communicated concerns (in past filings) that disclosure of the information found in the Sealed Exhibits could lead to public embarrassment[;]" (3) "many of the Sealed Exhibits contain personal medical information or other personal identifying information of the Plaintiff.  This information is sensitive in nature and confidential, and there is no alternative to sealing that would provide it sufficient protection[;]" and (4) "[t]he Sealed Exhibits refer to documents that have been marked 'CONFIDENTIAL' pursuant to the Parties' Stipulated Protective Order . . . The information from the confidential documents referred to in the Sealed Exhibits are material to the Motion, and there is no alternative to sealing that would provide sufficient protection to such information." (ECF No. 71, at 2).  After Defendants filed the motion to seal, Plaintiff himself filed some of the referenced documents publicly in his response to the cross-motion.  (ECF No. 82).  Specifically, Plaintiff filed copies of Defendants' Exhibits 6, 21, 17, 19, 36, and 39 in his motion for summary judgment and copies of Defendants' Exhibits 13, 14, 15, 16, 17, 19, 21, 32, 36, 37, and 39 in his supplement to his opposition.  (ECF Nos. 68; 82).  Thus, there appears to be no reason to seal those documents, and the motion to

seal is moot in that regard.  Defendants' other exhibits, however,
have not been filed publicly.

The Fourth Circuit has reminded us that:

> It is well settled that the public and
> press have a qualified right of access to
> judicial documents and records filed in civil
> and criminal proceedings.  *See Richmond
> Newspapers, Inc. v. Virginia*, 448 U.S. 555,
> 580 n.17, 100 S.Ct. 2814, 65 L.Ed.2d 973
> (1980); *Nixon v. Warner Communications, Inc.*,
> 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d
> 570 (1978); *Media Gen. Operations, Inc. v.
> Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005).
> The right of public access springs from the
> First Amendment and the common-law tradition
> that court proceedings are presumptively open
> to public scrutiny.  *Va. Dep't of State Police
> v. Wash. Post*, 386 F.3d 567, 575 (4th Cir.
> 2004).  "The distinction between the rights of
> access afforded by the common law and the
> First Amendment is significant, because the
> common law does not afford as much substantive
> protection to the interests of the press and
> the public as does the First Amendment."  *In
> re United States for an Order Pursuant to 18
> U.S.C. Section 2703*, 707 F.3d 283, 290 (4th
> Cir. 2013) (quoting *Va. Dep't of State Police*,
> 386 F.3d at 575) (internal quotation marks
> omitted).  The common-law presumptive right of
> access extends to all judicial documents and
> records, and the presumption can be rebutted
> only by showing that "countervailing interests
> heavily outweigh the public interests in
> access."  *Rushford* [*v. New Yorker Mag., Inc.*],
> 846 F.2d [249,] 253 [(4th Cir. 1998)].  By
> contrast, the First Amendment secures a right
> of access "only to particular judicial records
> and documents," *Stone* [*v. Univ. of Marland
> Med. Sys. Corp.*], 855 F.2d [178,] 180 [(4th
> Cir. 1998)], and, when it applies, access may
> be restricted only if closure is "necessitated
> by a compelling government interest" and the
> denial of access is "narrowly tailored to
> serve that interest," *In re Wash. Post Co.*,

> 807 F.2d 383, 390 (4ᵗʰ Cir. 1986) (quoting
> *Press-Enter. Co. v. Superior Court*, 464 U.S.
> 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)
> (internal quotation marks omitted)).

*Doe v. Pub. Citizen*, 749 F.3d 246, 265-66 (4ᵗʰ Cir. 2014).   The

*Public Citizen* court also explained that:

> When presented with a motion to seal, the law
> in this Circuit requires a judicial officer to
> comply with the following procedural
> requirements: (1) provide public notice of
> the sealing request and a reasonable
> opportunity for the public to voice objections
> to the motion; (2) consider less drastic
> alternatives to closure; and (3) if it
> determines that full access is not necessary,
> it must state its reasons—with specific
> findings—supporting closure and its
> rejections of less drastic alternatives.

*Id.* at 272 (citing *In re Knight Pub. Co.*, 743 F.2d 231, 234-35 (4ᵗʰ

Cir. 1984)); *see also Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302

(4ᵗʰ Cir. 2000).   In addition, Local Rule 105.11 requires the party

seeking sealing to include "(a) proposed reasons supported by

specific factual representations to justify the sealing and (b) an

explanation why alternatives to sealing would not provide

sufficient protection."

Even where, as here, the parties have agreed to a pretrial

discovery protective order, the Fourth Circuit has ruled that "once

the documents [are] made part of a dispositive motion [such as one

for summary judgment], they los[e] their status as being 'raw

fruits of discovery,' and that discovery, 'which is ordinarily

conducted in private, stands on a wholly different footing than

does a motion filed by a party seeking action by the court.'" *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004) (quoting *Rushford*, 846 F.2d at 252). Thus, a protective order is "not sufficient, by itself, to justify the continued sealing of filings in court." *Chaplick v. Jeng Fen Mao*, No. 13-cv-2070-PWG, 2014 WL 884069, at *3 (D.Md. Mar. 5, 2014).

Defendants' motion to seal has been pending on the docket for almost eleven months and no objection to sealing has been filed. Therefore, the notice requirement has been met. No less drastic alternatives to sealing exist as to the exhibits containing Plaintiff's medical records. (ECF No. 73-24). Plaintiff's interest in keeping medical information private outweighs the public interest in access. *See Ghaisar v. United States*, No. 1:19-cv-01224-CMHIDD, 2020 WL 6948183, at *1 (E.D.Va. Oct. 27, 2020) ("A party's interest in keeping private personal medical information heavily outweighs the public interests in access."). Thus, Defendants' motion will be granted as to exhibit 32.

Defendants' motion, however, is insufficient with regard to the other exhibits. Defendants have not provided any support for their motion other than their conclusory statements that the exhibits contain "proprietary information," that their disclosure could lead to "public embarrassment," and that the information was marked confidential pursuant to the parties' protective order. (ECF No. 71, at 1-2). Less drastic alternatives to sealing exist,

such as redacting minimal portions of the exhibits that contain information such as personal identifiers of third parties.  At this time, however, the court will grant summary judgment, closing the case in this court, and this opinion, which recounts—and indeed, quotes in depth—relevant portions of those exhibits, has sufficiently disclosed the contents of the exhibits to satisfy the public's interest in access.  *See, e.g.*, *Q.C. v. Winston-Salem/Forsyth Cnty. Sch. Bd. of Educ.*, No. 1:19-cv-1152, 2022 WL 1686905, at *13 (M.D.N.C. May 26, 2022) (granting motion to seal where "this Court's discussion of the content of the sealed documents herein is sufficient to satisfy the public's limited interest in their content.").  The motion to seal will therefore be granted, except for the portions of the exhibits contained in this opinion.

## V.   Plaintiff's Motion to Quash/Dismiss Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment

Plaintiff moves to quash or dismiss Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment. (ECF No. 77).  Plaintiff argues that Defendants' motion to dismiss based on fraud and spoliation lacks merit because he has "not engaged in any spoliation or distraction [sic, destruction] of evidence[.]"  (ECF No. 77, at 1).  He also requests that the court "consider imposing appropriate sanctions for filing a frivolous motion."  (*Id.* at 2).  Finally, he asserts that "[t]he facts and

evidence presented thus far clearly demonstrate that there are disputed issues that require a full trial to resolve." (*Id.*).

Plaintiff's motion was likely intended to serve as an opposition to Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment.  It was construed as such in considering Defendants' motion.  *See, e.g.*, *Beggs v. Am. Bankers Ins. Co. of Fla.*, No. 4:17-cv-110-ALWA, 2019 WL 13249923, at *2 & n.2 (E.D.Va. July 25, 2019) (dismissing motion to quash "for administrative purposes" where it was "clearly intended to serve as Plaintiffs' opposition to the three Motions to Dismiss . . . In deference to Plaintiffs' *pro se* status, the Court accepts Plaintiffs' filings, and has considered them in its analysis of the pending motions."); *Broadnax v. Dep't of Veteran Affs. Washington Mut. Bank*, No. 2:04-cv-693-J, 2005 WL 1185809, at *5 (E.D.Va. May 19, 2005) (denying motion to quash where plaintiff "seems to merely object to Defendant's arguments[]"); *Ramseur v. Reich*, No. 2:95-cv-0382-C, 1997 WL 907896, at *22 (S.D.W.Va. Mar. 31, 1997) (denying motion to quash and explaining that "[t]o the extent that it was intended as a memorandum of law submitted in response to defendant's motion to dismiss, it was considered as such.").  Accordingly, Plaintiff's motion will be denied.

## VI.  Defendants' Motion to Strike Plaintiff's Correspondence, Response in Opposition, Supplement, and Second Response

After Defendants filed the motion to dismiss or, in the alternative, cross-motion for summary judgment, Plaintiff was instructed that he needed to file a response by October 24, 2023. (ECF No. 74).  Plaintiff filed his motion to quash/dismiss Defendants' motion on October 24, 2023.  (ECF No. 77).  Plaintiff then filed:  (1) correspondence on November 6, 2023, (ECF No. 80); (2) an opposition to Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment on November 6, 2023, (ECF No. 81); (3) a supplement to his opposition on November 7, 2023, (ECF No. 82); and (4) a second opposition on November 8, 2023, (ECF No. 83).  Defendants move to strike the correspondence, opposition, supplement, and second opposition as untimely.  (ECF No. 84).

Court generally do not consider untimely submissions unless accompanied by a motion to extend time. Fed.R.Civ.P. 6(b)(1).  In considering whether to excuse a late filing, courts consider "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 533 (4th Cir. 1996) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*

*Ltd. P'ship*, 507 U.S. 380, 395 (1993)).  Here, although Plaintiff has not filed a motion to extend time, he has provided an explanation for his untimely filing in his correspondence.  He asserts that he attempted to file an opposition along with 26 exhibits on October 24, 2023, but that on November 11, 2023, he received an email stating that he failed to file an opposition. (ECF No. 80, at 1).  He submits that he asked the Clerk about his filing and "it was discovered it was a technical filing error" because he "submitted in error documents on top of each other which erased the previous document, leaving only the last document filed which was my last exhibit 26."  (*Id.*).  Plaintiff's explanation is consistent with the staff note on the docket stating that "ECF no. 7[6] was received via EDSS on 10/24/23 @ 9:25am, and was filed as a stand-alone document.  Clerk waited several hours to see if other filings would be filed to go along with it, and none were received. Docketed as is at 12:40pm."

Accepting Plaintiffs' untimely filings would present no danger of prejudice to Defendants because their motion for summary judgment will be granted.  The delay is not significant, and although the filing error may have been within Plaintiff's control, he appeared to have acted in good faith.  His pro se status also weighs in favor of considering his filings.  Consequently, Defendants' motion to strike will be denied.  *See, e.g.*, *King v. Washington Metro. Area Transit Auth.*, No. 14-cv-2752-TDC, 2016 WL

8716253, at *2 (D.Md. Feb. 26, 2016) (denying motion to strike even where the party "provided no valid explanation for the late filing[]" because "acceptance and consideration of the Opposition will not in any way prejudice WMATA on the Motion for Summary Judgment[]"); *Alston v. Trident Asset Mgmt., LLC*, No. 18-cv-575-PJM, 2019 WL 2525378, at *5 n.7 (D.Md. June 18, 2019) ("Trident has also filed a Motion to Strike Alston's Opposition to its Motion for Summary Judgment as untimely.  Because the Court has decided to grant Trident's Motion for Summary Judgment, the Court will DENY Trident's Motion to Strike.") (internal citation omitted).

## VII. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment will be denied, Defendants' motion to seal will be granted as limited herein, Defendants' motion to dismiss will be denied but their alternative cross-motion for summary judgment will be granted, Plaintiff's motion to quash will be denied, and Defendants' motion to strike will be denied.  A separate order will follow.

                                    /s/
                        _____
                        DEBORAH K. CHASANOW
                        United States District Judge